UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Charles L. Marohn, Jr.,

Plaintiff,

vs.

The Minnesota Board of Architecture, Engineering, Land Surveying, Landscape Architecture, Geoscience, and Interior Design, et al.,

Defendants.

Case No. 23-CV-03717 PJS-LIB

**DEFENDANTS' MEMORANDUM SUPPORTING DISMISSAL**

Four years ago, the Complaint Committee of Defendant Minnesota Board of Architecture, Engineering, Land Surveying, Landscape Architecture, Geoscience and Interior Design began investigating Plaintiff Charles Marohn after he repeatedly lied about being an actively licensed professional engineer and then falsely denied doing so on his license application when he finally applied to reinstate his license. Marohn sued the Board in 2021 in federal court, seeking to enjoin any disciplinary action on First Amendment and retaliation grounds. He lost that case. The Board then pursued an administrative disciplinary action through the Minnesota Office of Administrative Hearings. Marohn lost that case and his appeal to the Minnesota Court of Appeals. In 2023, that decision became final when Marohn chose not to further appeal the court of appeals' rejection of his constitutional arguments. Now, for the third time, Marohn seeks to raise those same arguments. The Court should dismiss Marohn's complaint because Marohn's claims are precluded by the prior litigation. Alternatively, the Court should dismiss on the merits

because Marohn has no First Amendment right to lie about being a professional engineer and has pleaded no facts establishing a retaliatory motive by the Board.

## FACTS

The Board is the state agency in Minnesota with the authority to license and regulate architects, engineers, land surveyors, landscape architects, geoscientists, and certified interior designers. *See* Minn. Stat. §§ 326.02–.15 (2022). The Board is required to investigate complaints that allege or imply a violation of a law that the Board is empowered to enforce. *Id* §§ 214.01, subd. 3, .10, subds. 1–3 (2022). To do so, the Board has established a complaint committee. *Id.* § 326.111, subd. 1(b) (2022).

Marohn is a retired professional engineer. (Doc. 1, ¶ 2.) His licensed lapsed from July 1, 2018, to June 19, 2020. (*Id.* ¶¶ 25, 28.) While he was unlicensed he nevertheless advertised himself to the public as a professional engineer. (Doc. 1-1, at 134.) And when he renewed his license, he lied on the renewal application and falsely denied having done so. (*Id.* at 134–35.)

Based on Marohn's falsehoods regarding his licensure status and representations on his application, in 2020 the Committee began investigating Marohn. (*Id.* at 131.) Following a meeting between Marohn and the Committee and various settlement correspondence, the day that Marohn's response to the Committee's then-current settlement offer was due, Marohn sought a federal injunction against discipline on the theory that the statute prohibiting him from referring to himself as a professional engineer without a license violated the First Amendment and that any discipline was unconstitutionally retaliatory for

his political speech. *Compare id.* at 75, *with* Compl., *Marohn v. Minn. Bd. of Architecture, Eng'g, Land Surveying, Landscape Architecture, Geoscience and Interior Design*, No. 21-1241, 2021 WL 5868194 (D. Minn. Dec. 10, 2021) [hereinafter *Marohn I*].[1]

The court dismissed Marohn's federal suit on *Younger* abstention grounds. *Marohn I*, 2021 WL 5868194, at *1 The court held that there were ongoing state disciplinary proceedings and that Marohn would have the opportunity to raise his constitutional arguments in the state proceedings. *Id.* at *3–4. The court also rejected Marohn's argument that the bad-faith exception to *Younger* should apply, reasoning that Marohn had pleaded "no facts that indicated that the Board exhibited any animus towards him or that they retaliated against him." *Id.* at *5. Marohn did not appeal that dismissal, and the disciplinary case proceeded through the administrative-hearing process at the Minnesota Office of Administrative Hearings. (*See generally* Doc. 1-1, at 109–18.)

In that disciplinary process, Marohn had the opportunity to conduct discovery, including the ability to compel responses if he considered responses inadequate and to compel witness depositions. *See* Minn. R. 1400.6700, subp. 2 (2023); *see also* Minn. R. Civ. App. P. 30, 33. Marohn also had the right to an evidentiary hearing to the extent there were disputed questions of fact. *See In re Minn. Living Assistance, Inc.*, 934 N.W.2d 300, 302 n.2 (Minn. 2019) (noting equivalence of OAH's summary disposition procedures to summary judgment and necessity of viewing facts in light most favorable to non-moving

---

[1] Doc. 1-1 establishes a response date of May 11, 2021. Although not contained within the complaint or its exhibits, in the interest of factual accuracy the Board notes that Marohn received a one-week an extension to May 18, 2021.

party). Marohn nevertheless chose not to present any evidence regarding the Board's alleged retaliatory motive beyond the evidence already rejected by the federal court as not even meeting the rule 8 pleading standard. (Doc. 1-1, at 95.) Instead, Marohn agreed with the Committee that the facts were undisputed. Following cross-motions for summary disposition, the ALJ recommended finding that Marohn violated state law and imposing discipline. (*Id.* at 109–10.) The Board adopted the ALJ's recommendation, censured and reprimanded Marohn, and imposed a $1,500 civil penalty. (*Id.* at 120–25.)

Dissatisfied with the Board's order, Marohn appealed to the Minnesota Court of Appeals. *In re the Pro. Eng'r License of Marohn*, No. A22-1099, 2023 WL 2847588 (Minn. Ct. App. Apr. 10, 2023) [hereinafter *Marohn II*]. There, he again argued that the statute prohibiting him from referring to himself as a professional engineer without a license violated the First Amendment and that any discipline was unconstitutionally retaliatory for his political speech. Relator's Br. at 10, 30, *id.*[2] The court affirmed the Board's order, implicitly rejecting Marohn's argument that any discipline was retaliatory. *Id.*, 2023 WL 2847588, at *1. The court did not reach Marohn's other First Amendment argument, holding that Marohn's lies on his renewal applications sufficiently justified the discipline imposed regardless of whether the Board could impose discipline for Marohn lying about being a professional engineer. *Id.* at *4.

[2] Although not included as an exhibit to the complaint, the Court may consider materials embraced by it and public records, like Marohn's brief in the state court case. *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 763–64 (8th Cir. 2012). For the Court's convenience, a copy of that brief is filed as Barr Declaration Exhibit 1.

Despite having the opportunity to seek review of this decision by the Minnesota Supreme Court, Marohn chose not to do so. Judgment, *id.* No. A22-1099.[3] Instead, after waiting eight months, Marohn has brought yet another federal suit against the Board. (Doc. 1, at 22.) He argues for the third time that the statute prohibiting him from referring to himself as a professional engineer without a license violated the First Amendment and (based solely on evidence he presented in the prior two cases) that any discipline was unconstitutionally retaliatory for his political speech. (*Id.* ¶¶ 65–73.) He asks the Court to declare section 326.02 and rule 1800.0200 unconstitutional as applied to Marohn and enjoin the Board from enforcing them.

## ARGUMENT

Marohn claims that the law prohibiting him from falsely holding himself out as a professional engineer violates his First Amendment rights and that *any* discipline the Board could ever impose against him must somehow be retaliatory for his alleged public advocacy work. The Court should dismiss Marohn's claims because Marohn previously raised both claims in prior proceedings. Alternatively, the Court should dismiss because Marohn has no First Amendment right to make false licensure claims, and Marohn has not pleaded any facts establishing a retaliatory motive by the Board or its members.

[3] Barr Decl. Ex. 2.

## I. MAROHN'S CLAIMS ARE PRECLUDED BY COLLATERAL ESTOPPEL AND RES JUDICATA.

Marohn claims that applying section 326.02 to his speech violates his First Amendment rights and is retaliatory. (Doc. 1, ¶¶ 65–73.) But Marohn previously raised both these claims in prior cases. He lost twice with respect to the retaliation claim, and he chose not to appeal with respect to the court's decision not to reach his First Amendment claim. Accordingly, the retaliation claim is barred by collateral estoppel, and both claims are barred by res judicata. The preclusive effect of both doctrines is a question of state law. *Anderson v. City of St. Paul*, 849 F.3d 773, 777 (8th Cir. 2017). Moreover, the doctrines' applicability may be decided on a motion to dismiss when it can be determined from the face of the complaint, materials embraced by the complaint, and public records. *C.H. Robinson*, 695 F.3d at 763–64.

### A. Collateral Estoppel Bars Marohn's Retaliation Claim.

In Minnesota, collateral estoppel applies when (1) the issue to be addressed is identical to an issue in a prior adjudication; (2) there was a final judgment on the merits in the prior adjudication; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party received a full and fair opportunity to be heard on the adjudicated issue. *Kvalvog v. Park Christian Sch., Inc.*, 66 F.4th 1147, 1152 (8th Cir. 2023) (citing *Ill. Farmers Ins. Co. v. Reed*, 662 N.W.2d 529, 531 (Minn. 2003)). Marohn's retaliation argument meets these four requirements based on both the dismissal of his first federal case and his loss in the state-court proceeding.

Beginning with Marohn's first federal case, the key issue in that case was whether the court should abstain from adjudicating the matter on the basis of *Younger* abstention (which dictates that when there is an ongoing state-level proceeding, federal courts should abstain from enjoining those proceedings). *Marohn I*, 2021 WL 5868194, at *1. To try and avoid application of *Younger*, Marohn argued that the bad-faith exception to the doctrine applied. *Id.* at *4. Under that exception, abstention is not appropriate when the state-level action "was brought in retaliation for the exercise of a constitutional right." *Id.* Marohn specifically argued that the Board was seeking discipline "in retaliation for his political speech." *Id.* at *5. The court rejected this argument, holding that "Marohn . . . pled no facts that indicated that the Board . . . retaliated against him." *Id.*

These circumstances satisfy the requirements for collateral estoppel. Marohn now pleads the exact same facts he pleaded in his prior case. *Compare* Compl. ¶ 46, *id.*, ECF No. 1,[4] *with* Doc. 1, ¶ 46. And, in that case, the Court held those facts did not establish retaliation. Marohn was also certainly a party to those proceedings, he had the opportunity to brief his argument that those facts established retaliation, and he had the opportunity to appeal the court's rejection of that argument. Finally, that the dismissal in that case was without prejudice is immaterial. "[A]n issue actually decided in a non-merits dismissal is given preclusive effect in a subsequent action between the same parties" even if the dismissal is without prejudice. *Pohlmann v. Bil-Jax, Inc.*, 176 F.3d 1110, 1112 (8th Cir.

[4] Barr Decl. Ex. 3.

1999). The prior federal litigation thus collaterally estops Marohn from arguing that Board discipline is barred by some impermissibly retaliatory motive.

The state-court proceeding also provides an independent basis for collateral estoppel. In that proceeding, Marohn argued that the "Board's motivation against Marohn [was] for political rather than professional reasons." Relator's Brief at 10, *Marohn II*, No. A22-1099, 2023 WL 2847588.[5] The retaliation issue was thus raised in the state-court proceeding. Moreover, again, Marohn was obviously a party, and the court issued a final judgment. Judgment, *id.*[6] Finally, Marohn had a full and fair opportunity to be heard on the retaliation issue. Marohn had the opportunity to call witnesses to prove a retaliatory motive by the Board. *See generally* Minn. R. 1400.7200, 1400.7300, 1400.7800 (2023). And he also had the opportunity to conduct discovery, including by deposition or interrogatory, into the Board's motivations. *See id.* 1400.6700, subp. 2 ("Any means of discovery available pursuant to the Rules of Civil Procedure for the District Court of Minnesota is allowed."); *see also* Minn. R. Civ. P. 30 (depositions), *id.* 33 (interrogatories). And after he lost at the Minnesota Court of Appeals, he could have—but did not—petition the Minnesota Supreme Court for review. Minn. R. Civ. App. P. 117. Again, this means Marohn is estopped from raising his retaliation argument for a third time.

### B. Res Judicata Bars Both Claims.

Res judicata applies to bar subsequent claims when (1) the earlier claim involved the same claim for relief; (2) the earlier claim involved the same parties or their privies;

---

[5] Barr Decl. Ex. 1.
[6] Barr Decl. Ex. 2.

(3) there was a final judgment on the merits; and (4) the estopped party had a full and fair opportunity to litigate the matter. *State v. Joseph*, 636 N.W.2d 322, 327 (Minn. 2001). It applies to claims actually litigated as well as to claims that "could have been litigated" in the prior proceeding. *Id.* These elements are satisfied with respect to both of Marohn's claims.

Here, Marohn claims that section 326.02's prohibition on referring to himself as a professional engineer when he lacks a professional engineer license violates the First Amendment as-applied to Marohn and that any discipline by the Board would be retaliatory. These are precisely the claims that Marohn made in the state-court proceeding. Relator's Brief at 30, *Marohn II*, No. A22-1099, 2023 WL 2847588 ("[Section] 326.02, subd. 3(b) is unconstitutional as applied to Marohn."); *id.* at 10 ("[The] conference with committee reveals Board's motivation against Marohn [was] for political rather than professional reasons.").[7]

Similarly, the Minnesota Court of Appeals issued a final judgment in the case where Marohn made those claims. And Marohn was obviously a party to those proceedings. Thus, the second and third elements of res judicata are satisfied.

Finally, Marohn had a full and fair opportunity to litigate both claims. Marohn had the opportunity to raise his constitutional arguments to Minnesota's appellate courts. *See C.S. McCrossan Constr., Inc. v. Minn. Dep't of Transp.*, 946 F. Supp. 2d 851, 866 (D. Minn. 2013) (recognizing competence of Minnesota Court of Appeals to address

[7] Barr Decl. Ex. 1.

constitutional rights); *see also Marohn I*, 2021 WL 5868194, at *4 (holding state-court procedures provide Marohn an adequate opportunity to raise constitutional defenses). That the court of appeals did not reach his First Amendment arguments regarding section 326.02 is of no import. Marohn could have petitioned for further review of that decision. "[W]hen a litigant is willing to gamble on the outcome of a lawsuit and sit silent when he has an opportunity to present evidence, he should be bound by the result, whatever it may be. . . . [T]he same may be said when a litigant sits silent on the opportunity to appeal." *State v. Joseph*, 636 N.W.2d 322, 329 (Minn. 2001) (applying res judicata to unappealed judgment); *see also Schwartz v. Bogen*, 913 F.3d 777, 781 (8th Cir. 2019) ("There are res judicata consequences to a final, unappealed judgment on the merits.").

While such an appeal would have been a "gamble" (both because review by the Minnesota Supreme Court is discretionary and because one of the Board's arguments was that Marohn could be subject to the same discipline even without the section 326.02 violation), Marohn's choice not to take that gamble does not alter the decision's res judicata effect. And that effect precludes Marohn from reraising his First Amendment and retaliation arguments in this litigation.

## II. THE FIRST AMENDMENT DOES NOT PROTECT LIES ABOUT PROFESSIONAL CREDENTIALS.

If the Court reaches the merits of Marohn's content-based restriction claim, it should still be dismissed. The First Amendment does not protect false licensure statements, it does not protect false statements made for material gain, and it does not protect false commercial

speech. Marohn's statements fall into all of these categories (any one of which would be fatal to his claim). Accordingly, Marohn has no First Amendment injury.

Although the First Amendment protects a wide swath of speech, not all speech is protected; in particular, certain categories of false speech are unprotected. *United States v. Alvarez*, 567 U.S. 709, 718–19 (2012) (plurality opinion); *see also Animal Legal Defense Fund v. Reynolds*, 8 F.4th 781, 786 (8th Cir. 2021) (following *Alvarez* plurality to conclude that some "false statements have no value or constitutional protection"). Those categories include speech restrictions that are "part of a long . . . tradition of proscription," such as false licensure claims, false statements made for material gain, and false commercial speech. *Alvarez*, at 722–23 (historically unprotected or material gain); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980) (commercial speech). Marohn's false claims fit into all three categories.

### A. False Statements Regarding Professional Qualifications Are Unprotected by the First Amendment.

Marohn claims a First Amendment right to lie about his professional qualifications. But such falsehoods are part of a long tradition of proscription. The Supreme Court has repeatedly upheld statutes that prohibit the practice of a profession where "practicing" is defined as the mere act of claiming to have the professional credential. And more generally, the tradition of such prohibitions can be traced from colonial times, to the United States' founding, to the present day.

First, the Supreme Court has repeatedly upheld statutes prohibiting claims of false credentials. For example, in *Dent v. West Virginia*, an unlicensed physician was convicted

for "publicly professing to be a physician, prescribing for the sick, and appending to his name the letters, 'M. D.'" 129 U.S. 114, 118 (1889). He then challenged the constitutionality of his conviction. *Id.* Significantly, the statute considered a person to be "practicing medicine" and subject to prosecution merely by claiming to be a physician or appending the letters "M. D." to the person's name, even if the person never actually dispensed any medical advice or performed any medical procedure. John A. Warth, *Code of West Virginia*, ch. 150, § 13 (2d ed. 1887).[8] The Court nevertheless rejected the defendant's constitutional challenges and upheld the conviction. *Dent*, 129 U.S. at 128.

In reaching that holding, the Court made at least two recognitions significant to this case. First, the Court recognized that governments "from time immemorial" have exacted a particular degree of skill and learning to practice a particular profession, and that to ensure that the public could "confidently rely" called for the issuance of licenses. *Id.* at 122. Second, the Court recognized that since most members of the public are untrained in any particular profession, "comparatively few can judge of the qualifications of learning and skill" any professional possesses, so it is imperative that the public be able to place "[r]eliance . . . upon the assurance given by [the professional's] license." *Id.* at 122–23. Diluting the reliability of that assurance by allowing false claims of licensure, whether it be falsely claiming to be a physician or a professional engineer, undermines that protection.

The Court also upheld a very similar statute in *Watson v. Maryland*, 218 U.S. 173 (1910). Again, the statute considered a person to be illegally practicing medicine if the

---

[8] Available at https://books.google.com/books?id=coA0AQAAMAAJ.

person "shall append to his or her name the letters M. D., or prefix the word doctor, or the abbreviation thereof, Dr., to his or her name, with the intent thereby to imply that he or she is a practitioner of medicine or surgery." 1 John Prentiss Poe, *The Maryland Code*, art. 43, § 101 (1904).[9] The defendant challenged the constitutionality of the statute. *Watson*, 218 U.S. at 175–76. Again, the Court rejected the challenge, holding that it did not "interfere [with] fundamental rights guaranteed by the Federal Constitution." *Id.* at 176. The Court further noted that "obviously" the state could exert its police power to ensure that only properly qualified people undertook the responsibilities of a profession. *Id.*

These holdings are consistent with the long historical tradition that false licensure claims are unprotected. The first American medical practice act was enacted in 1760. Louis Caldwell, *Early Legislation Regulating the Practice of Medicine*, 18 ILL. L. REV. 225, 234 (1924). Based on concerns that many victims were "persuaded to become . . . patients" of "ignorant and unskilful [sic]" people, New York created a testimonial (i.e. a statement of qualification) that could only be used by people approved by the city government. 2 William Livingston & William Smith, *Laws of New York* 188–89 (1762).[10] New Jersey enacted a very similar act in 1772. Caldwell at 234. And in 1773, Connecticut enacted an act for the "Suppressing of Mountebacks" (sellers of quack medicine). *Id.* at 235; *see also* Timothy Green, *Acts and Laws of the State of Connecticut, in America* 161–62 (1784).[11]

---

[9] Available at https://books.google.com/books?id=Kt4XAAAAYAAJ.
[10] Available at https://books.google.com/books?id=vN41AQAAMAAJ.
[11] Available at https://babel.hathitrust.org/cgi/pt?id=osu.32437121663724&view=1up&seq=181.

Notably, the Connecticut act was intended not just to prevent the selling of quack medicine itself, but also to address concerns about quack doctors "publicly advertising and giving notice of their skill and ability." Green at 161. By 1894, Massachusetts and New Hampshire were the only two states in the country that did not have medical practice acts.[12] Caldwell at 21. In addition to seeking to ensure that people practiced medicine safely, such laws are also motivated by desires to ensure that unqualified individuals were not advertising with credentials they lacked in the first place. *See* Reginald H. Fitz, *The Legislative Control of Medical Practice*, 16 MED. COMMC'NS MASS. MED. SOC'Y 275, 279, 292 (1894) (raising concerns about false licensure claims and limitations on recovery in tort for malpractice by unlicensed individuals after the fact).[13]

Courts have uniformly upheld these laws in both the medical and other professions, in many cases explicitly recognizing the historical tradition of the state's ability to regulate using professional titles even if a practitioner has not engaged in any substantive malpractice. *Tex. State Bd. of Pub. Acct. v. Fulcher*, 515 S.W.2d 950, 954 (Tex. Civ. App. 1974) ("Statutes which prohibit anyone from holding himself out as a 'public accountant' or a 'certified accountant' without having actually received a certificate or permit to practice public accountancy have generally been upheld."); *Semler v. Or. State Bd. of Med. Exam'rs*, 34 P.2d 311, 313–14 (Or. 1934) ("It is well settled that the Legislature may enact

---

[12] In the mid-1800s, there was substantial period of medical deregulation, but these repeals were driven by a push of public opinion supporting non-traditional medicine (such as homeopathy), not any First Amendment concerns. *See* Caldwell at 240–41.
[13] Available at
https://archive.org/details/medicalcommunica16mass/page/n285/mode/2up.

laws which tend to prevent the perpetration of fraud although the act prohibited is harmless in itself."); *Sherwood v. Wise*, 232 P. 309, 311 (Wash. 1925) ("The act does not in express terms make the mere rendering of architectural service by one not holding a license certificate unlawful . . . the language of the act manifestly expresses the legislative intent that it shall be unlawful for one not holding a license certificate to assume the professional title of architect."); *State v. De Verges*, 95 So. 805, 806 (La. 1923) (recognizing "from time immemorial" the power of state to issue certification "upon which community may rely"); *Price v. State*, 171 N.W. 77, 79–80 (Wis. 1919) ("[T]he people should be protected from fakers and incompetents who hold themselves out as competent . . . ."); *Meffert v. State Bd. of Med. Registration & Examination*, 72 P. 247, 248–49 (Kan. 1903) ("This power was recognized in England more than 300 years ago, and has been the law of that country ever since."); *Eastman v. State*, 10 N.E. 97, 98 (Ind. 1887) ("The rule requiring physicians to possess learning and skill is a very ancient one.") (citing *Bonham's Case* (1610) 77 Eng. Rep. 646; 5 Co. Rep. 113b); *Logan v. State*, 5 Tex. App. 306, 312 (Tex. Ct. App. 1878) ("The people of this country have long realized the necessity of legal protection against incompetents and pretenders in the practice . . . and of providing some means for inquiring into the qualifications of those who claimed to possess the necessary prerequisites to practise [sic] . . . ."); *Hewitt v. Charier*, 33 Mass. (16 Pick.) 353, 354 (Mass. 1835) (legislature "wisely act[ed] upon maxim . . . 'that prevention is better than cure'"); *see also Fulter v. Tex. State Bd. of Acct.*, 571 S.W.2d 366, 370 (Tex. Civ. App. 1978); *Pitts v. State Bd. of Exam'rs of Psychs.*, 160 A.2d 200, 201–202 (Md. Ct. App. 1960); *Elliott v. Univ. of Ill.*, 6 N.E.2d 647, 651 (Ill. 1936); *State ex rel. Short v. Riedell*, 33 P. 684, 689 (Okla. 1924);

*Commonwealth v. Porn*, 82 N.E. 31, 32 (Mass. 1907); *State v. Call*, 28 S.E. 517, 517–18 (N.C. 1897); *People v. Hasbrouck*, 39 P. 918, 920 (Utah Terr. 1895).

These holdings are also consistent with the policy motivating historical medical-practice laws. Just as waiting to discipline the quack doctors of the 1700s until after they have prescribed a dangerous medicine does nothing to protect patients, waiting to discipline an unlicensed professional engineer until after a bridge collapses does nothing to prevent the collapse. *Cf. In re Individual 35W Bridge Litig.*, 806 N.W.2d 820, 825 (Minn. 2011) (describing significant amount of litigation arising from bridge collapse). States can reduce the likelihood of such individuals being hired by preventing them from falsely claiming to have credentials in the first place. Conversely, allowing individuals to falsely claim professional credentials so long as they are not seeking specific clients would subject the public to significant harms. For example, a non-physician might publish dangerous medical advice and lend it an air of credibility by falsely claiming to be a licensed doctor; or a person could impersonate an attorney to visit a coconspirator in prison.

This history demonstrates that false licensure prohibitions have a long history of acceptance, including before, around, and after the time that the First Amendment was adopted. It is thus a category of speech that has "been historically unprotected." *See Alvarez*, 567 U.S. at 722 (recognizing existence of such categories). Minnesota may therefore prohibit individuals from falsely claiming to hold a professional credential that they lack.

### B. False Statements Made in Furtherance of a Material Gain Are Unprotected by the First Amendment.

False claims of licensure are not the only category of statements historically unprotected by the First Amendment. In *Alvarez*, the Court also recognized that statements made for material gain have also been historically unprotected. 567 U.S. at 703. Marohn's false licensure statements also fall into this category, and are accordingly unprotected by the First Amendment.

By his own admission, Marohn believes that not being able to lie about being a professional engineer "will reduce his creditability with his audience." (Doc. 1, ¶ 62.) Putting aside the irony that Marohn thinks that dishonesty increases his credibility, Marohn's "audience" is, by Marohn's acknowledgement, people that buy his books or pay to view his seminars. (*Id.* at ¶ 63 (books); Doc. 1-1, at 125 (noting Marohn's acknowledgement that people "buy [his] books, take [his] courses, engage Marohn as a speaker"). Marohn thereby all but expressly concedes he seeks to misrepresent his credentials for material gain—he believes more people will pay him if he falsely claims to be a professional engineer. Those payments are obviously a material gain. And under *Alvarez*, the Board can therefore constitutionally apply section 326.02 against Marohn if he violates it.

### C. False Commercial Speech Is Unprotected by the First Amendment.

False commercial speech is also unprotected by the First Amendment. *Cent. Hudson*, 447 U.S. at 563. Accordingly, this category provides a third basis for holding that Marohn's false-licensure claims are unprotected.

Using professional titles constitutes commercial speech, which is entitled to less First Amendment protection. *Ibanez v. Fla. Dep't of Bus. & Prof'l Reg., Bd. of Acct.*, 512 U.S. 136, 144 (1994); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). And when such speech is false, it is entirely unprotected, and accordingly, "[t]he government may ban forms of communication more likely to deceive the public than to inform it." *Cent. Hudson*, 447 U.S. at 563.

Marohn suggests that his speech does not fit into this category, asserting that he is not explicitly saying, "You can hire me to perform professional engineering services," and is instead only claiming to be a professional engineer. (Doc. 1, at 67.) But the Supreme Court has long rejected this illusory distinction. Instead, the Court has correctly recognized that the use of a trade name alone effectively advertises to the public the ability to buy goods or services associated with that name.

For example, in *Friedman v. Rogers*, the Court addressed a statute that prohibited optometrists from using certain trade names. 440 U.S. 1, 3, 21 (1979). The Court first concluded that using a trade name was a form of commercial speech because once the name came to be known in the community it conveyed information about the "type . . . and quality" of services the business could perform. *Id*. at 11. More specifically, the Court noted that such names had the potential to mislead the public because a trade name could imply a quality that simply was not present. *Id*. at 12. The Court then upheld the prohibition because the statute merely ensured that information would be communicated "fully and accurately" and did no more than require information "appear in such a form as is necessary to prevent its being deceptive." *Id* at 16. The Court also recognized that the regulation had

"only the most incidental effect" on the optometrists' speech because it did not prohibit them from making any other substantive statements.

Post-*Friedman*, courts across the country have applied it and its progeny to uphold laws prohibiting the use of false or misleading professional titles as unprotected commercial speech. *See, e.g.*, *Maceluch v. Wysong*, 680 F.2d 1062, 1068–70 (5th Cir. 1982) (use of "M.D."); *Acct.'s Soc'y of Va. v. Bowman*, 860 F.2d 602, 605–06 (4th Cir. 1988) (use of "public accountant"); *Seabolt v. Tex. Bd. of Chiropractic Exam'rs*, 30 F. Supp. 2d 965, 967–69 (S.D. Tex. 1998) (use of "chiropractic physician"); *Van Breeman v. Dep't of Prof'l Regulation*, 694 N.E.2d 688, 691–92 (Ill. App. Ct. 1998) (use of "professional engineer").

False claims of being a professional engineer closely parallel the statements in *Friedman* and these other cases. First, like the tradenames in *Friedman*, The phrase "professional engineer" is a recognized credential in the industry, requiring completion of the multistep, multi-year process of (1) passing an eight-hour fundamentals exam, (2) completing four years of progressive experience in a particular engineering field, (3) passing another eight-hour exam testing the knowledge gained during the four-year period, and finally, (4) obtaining and maintaining state licensure. Doug McGuirt, *The Professional Engineering Century*, P.E. MAG., June 2007, at 28;[14] see also Minn. R. 1800.2500, .2700 (2023) (laying out Minnesota's education and experience requirements

---

[14] Available at https://www.nspe.org/sites/default/files/resources/pdfs/pemagazine/june2007_the_professional_engineering.pdf.

for professional engineer licensure). The title therefore conveys with it a particular level of training, quality, and service, and most importantly, conveys that one is licensed by the state to perform professional engineering. Second, an unlicensed person's use of "professional engineer" similarly has potential to mislead the public by implying a quality or credential that is not present. Third, a prohibition on falsely using the title has only the "most incidental effect" on Marohn's speech because he remains free to express whatever substantive points he wishes to make; he simply cannot falsely hold himself out as a person capable of doing professional engineering work before doing so.

* * *

In summary, Marohn has no First Amendment right to lie about his professional credentials because such claims fall into three different categories of unprotected speech. Marohn is free to advocate for whatever public policy positions he wishes, to do so in conjunction with saying he used to be a professional engineer, or even to say that "in his opinion as a retired professional engineer" a particular policy should be pursued, but he cannot falsely claim to be an active professional engineer. Accordingly, the Court should dismiss Marohn's challenge to the application of section 326.02 to his speech.

## III. MAROHN FAILED TO PLEAD FACTS ESTABLISHING A RETALIATORY MOTIVE BY THE BOARD.

Marohn also seeks an injunction against hypothetical future[15] Board discipline on the theory that any such discipline would be inherently retaliatory for Marohn

[15] Marohn's complaint does not, on its face, indicate he is seeking relief from the past discipline. Insofar as he is seeking such relief, that relief is clearly unavailable because it would amount to a challenge to the Minnesota Court of Appeals's decision in *Marohn II*.

"advocat[ing] against the interests of professional engineers." (Doc. 1, ¶ 71.) Even if this claim is not barred by collateral estoppel or res judicata, Marohn still has not pleaded *any* facts establishing a retaliatory motive on the part of the Board or its constituent members, even after having three-and-a-half more years since his last federal complaint to do so. Instead, he pleads only facts supposedly related to the Board's motive for past discipline, which have, moreover, been repeatedly rejected because they do not establish a retaliatory motive. Additionally, public records show that the Board has uniformly applied the very same statutes to multiple individuals in the last five years alone, regardless of whether they engaged in so-called advocacy activities.[16]

To establish a First Amendment retaliation claim, a plaintiff must show that he engaged in a constitutionally protected activity, that the defendant's actions caused the plaintiff an injury that would chill a person of ordinary firmness from continuing to engage in the protected activity, that the defendant had a retaliatory animus, and that a causal connection exists between the retaliatory animus and the injury. *Scott v. Tempelmeyer*, 867 F.3d 1067, 1070 (8th Cir. 2017). To establish the causal connection, a plaintiff must show that the plaintiff was "singled out" because the plaintiff exercised constitutional rights. *Bernini v. City of Saint Paul*, 665 F.3d 997, 1007 (8th Cir. 2012). This is a "but-for" causation standard, and if the government would have taken the same action even had the

---

Such relief is barred by the *Rooker-Feldmann* doctrine, which "states that district courts do not have subject matter jurisdiction over challenges to state court decisions in judicial proceedings." *Charchenko v. City of Stillwater*, 47 F.3d 981, 983 (8th Cir. 1995).

[16] Courts may consider matters of public record, even if outside the pleadings, when considering whether to grant a rule 12(b)(6) motion. *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012).

person not engaged in the protected First Amendment activity, then the claim fails. *Osborn v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007).

Even assuming Marohn engaged in some type of protected public advocacy, he failed to state a claim as a matter of law because he did not plead factual allegations that make the retaliatory animus or causal-connection elements plausible. Marohn alleges that he engages in advocacy work that has made him unpopular with professional engineering businesses and trade organizations in general, that a member of the public retaliated against Marohn by complaining about him to the Board, and that Committee members' concerns about Marohn falsely representing that he was a professional engineer at his public speaking appearances led the Board to initiate the prior state-level action. (Doc. 1, ¶¶ 3, 33, 46.) None of these facts establish any motive on the part of the Board or its members.

The only retaliatory motive alleged by Marohn is a retaliatory motive by the complainant, who is not a member of the Board and has no say in whether the Board acts on the complaint or how a Board matter resolves. "[R]egulatory and law enforcement agencies routinely act on the basis of information provided by private parties who harbor a grudge or who hope to benefit personally from their complaints." *Osborne*, 477 F.3d at 1007. Courts do not impute the complainant's ulterior motive to the government actors. *Id.*

Marohn also obliquely suggests a retaliatory intent by noting that in the prior state-level action, his former attorney sent the committee a letter that cited past cases where the Board did not allege "fraud" when applicants failed to timely renew their licenses *after* the Committee had already begun its investigation. (Doc. 1, ¶ 45.) The flaws with this argument are threefold.

First, as reflected in the source documents Marohn attached to his complaint, the Committee never alleged that Marohn engaged in fraud in the prior proceeding. The committee's four proposed consent orders to Marohn alleged only that he made a false statement on his renewal application, engaged in conduct involving dishonesty or misrepresentation by holding out as a professional engineer while unlicensed, or failed to disclose a material fact on his renewal form. (Doc. 1-1, at 32, 45, 67, 79.) Marohn's claim that he was singled out for allegations of fraud is demonstrably false from the face of the complaint and its accompanying exhibits.

Second, the cases cited in the attorney's letter are distinguishable from the conduct for which Marohn was disciplined in the past proceeding. (*Id.* at 54.) The letter cites two cases, *In re Sveum*, No. 2020-0017 (Minn. Bd. AELSLAGID June 24, 2020),[17] and *In re Kriens*, No. 2019-0104 (Minn. Bd. AELSLAGID June 24, 2020).[18] But in both cases, the respondents candidly disclosed in their applications that they had represented themselves as having licenses while unlicensed. *Sveum* ¶ 2(e); *Kriens*, ¶ 2(b). Marohn, in contrast, was disciplined for falsely stating on his application that he had not represented himself as a professional engineer while his license was expired.

Third, in the past five years alone the Board has on numerous occasions imposed discipline for making false certifications on a license application similar to discipline it imposed against Marohn in the prior case. *See, e.g.*, *In re Jackson*, No. 2023-0036 (Minn.

[17] Available at https://www.mn.gov/aelslagid/disciplinaryactions/2020/54244.pdf.
[18] Available at https://www.mn.gov/aelslagid/disciplinaryactions/2020/C02502.pdf.

Bd. AELSLAGID Nov. 30, 2023);[19] *In re Reiner*, No. 2022-0051 (Minn. Bd. AELSLAGID June 27, 2022); *In re Kelly*, No. 2021-0017 (Minn. Bd. AELSLAGID Mar. 19, 2021)[20]; *In re Prof'l Eng'r License of Smith*, No. 8-1006-36222 (Minn. Bd. AELSLAGID Mar. 12, 2020)[21]; *In re Brisske*, No. 2019-0057 (Minn. Bd. AELSLAGID Mar. 22, 2019).[22] Thus, prior Board actions do not demonstrate any intent to single out Marohn. Instead, those actions show that, when respondents make misrepresentations on their applications, the Board imposes discipline in order to discourage false applications from others to ensure that it is making licensing decisions based on accurate information. Because Marohn's complaint fails to allege any facts giving rise to a retaliatory motive by the Board, the Court should dismiss count two of Marohn's complaint.

## IV. MAROHN'S CLAIMS REGARDING MINNESOTA RULE 1800.0200 SHOULD BE DISMISSED BECAUSE THAT RULE ONLY DEFINES TYPES OF LICENSES.

Marohn seeks a declaration and injunction against the enforcement of Minn. R. 1800.0200 against him. (Doc. 1, at 22.) That rule is definitional, defining two types of licensure. Moreover, the Board has never threatened to enforce that rule (insofar as a definition could ever be enforced) against Marohn. Because there is nothing to enforce with respect to that rule, Marohn's request for a declaration and injunction regarding that rule must be dismissed.

---

[19] Available at https://www.mn.gov/aelslagid/disciplinaryactions/2023/58531.pdf
[20] Available at https://www.mn.gov/aelslagid/disciplinaryactions/2021/10926.pdf.
[21] Available at https://www.mn.gov/aelslagid/disciplinaryactions/2020/Smith_Brian.pdf
[22] Available at https://www.mn.gov/aelslagid/disciplinaryactions/2019/Brisske.pdf.

## CONCLUSION

The Court should dismiss Marohn's complaint as being precluded by his past federal and state-court cases. Alternatively, the Court should dismiss because Marohn has no First Amendment right to lie about his professional credentials and has not pleaded any facts establishing a retaliatory motive by the Board.

Dated: February 5, 2024

Respectfully submitted,

KEITH ELLISON
State of Minnesota
Attorney General

s/**Allen Cook Barr**
ALLEN COOK BARR
Assistant Attorney General
Atty. Reg. No. 0399094

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1487 (Voice)
(651) 297-1235 (Fax)
allen.barr@ag.state.mn.us

ATTORNEY FOR DEFENDANTS

|#5657846-v1