# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CHARLES L. MAROHN, JR., | Case No. 23-CV-03717 (NEB/LIB) |
| Plaintiff, | |
| v. | **PLAINTIFF'S MEMORANDUM IN IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT** |
| THE MINNESOTA BOARD OF ARCHITECTURE, ENGINEERING, LAND SURVEYING, LANDSCAPE ARCHITECTURE, GEOSCIENCE, AND INTERIOR DESIGN, and THE BOARD'S MEMBERS, Melisa Rodriguez, Chair, Daniel Kelsey, Vice Chair, Sally Korsh, Timothy Meyer, Meg Parsons, Alan Johnson, Denise Kazmierczak, Travis Thul, Daniel McAnich, Paul Vogel, Jason Amberg, Graham Sones, Daniel Hunter, Paul Brandt, Erica Larson, Claudia Reichert, Daniel Cermak, Rachel Dwyer, Christian Faste, Eric Friske, and David Stenseth, in their official capacities, or their successors, | |
| Defendants. | |

## INTRODUCTION

Plaintiff Charles L. Marohn, Jr. ("Marohn") is 52 years old.  He graduated from the University of Minnesota with an engineering degree in 1995, became a Minnesota licensed "professional engineer" in 2000 and began practicing as a civil engineer working with state and local governments.  After about a decade of work, Marohn became disgusted with the waste and abuse in civil engineering projects.  As a result, Marohn formed a non-profit corporation called "Strong Towns" to engage in public advocacy seeking, among other things, to advocate that state and local governments reduce the

amount spent on civil engineering projects.  Since 2012, Marohn has exclusively engaged in public speech advocating primarily that government entities spend less tax monies on engineering projects—public advocacy which is directly contrary to the economic interests of professional engineers.  Not surprisingly, Marohn's work with Strong Towns has not made him popular with professional engineering businesses and trade associations.

Despite no longer working as an engineer, Marohn maintained his professional-engineering license in Minnesota.  In 2018, though, Marohn failed to renew his biennial professional-engineering license.  When he learned of this in 2020, Marohn successfully applied to reinstate his license and successfully applied for a biennial renewal of his license.

Everything should be fine at this point, but it was not.  Strong Towns had become very successful and state and local governments were curtailing the amount they spent on civil engineering projects–to the financial detriment of professional engineers.  In 2020, an engineer filed a complaint with Defendant the Minnesota Board of Architecture, Engineering, Land Surveying, Landscape Architecture, Geoscience, and Interior Design ("Board") alleging that Marohn referred to himself as a "professional engineer" from 2018-2020 while unlicensed–a violation of Minn. Stat. §326.02, subd. 3(b) which prohibits anyone other than a currently licensed professional engineer from identifying themselves as "professional engineer" under any circumstances. The Board ended up sanctioning Marohn for calling himself a professional engineer at Strong Town events

and in books Marohn had published. The Minnesota Court of Appeals affirmed the sanction without reaching Marohn's constitutional claims at issue in this action.

In 2022, Marohn decided to "retire" as a licensed professional engineer. However, Minn. Stat. §326.02 subd. 1 provides that previously licensed professional engineers who have retired may only identify themselves as a "professional engineer" if they precede the phrase "professional engineer" with the word "retired:"

> This subdivision does not preclude an individual who retired from one of the professions listed in this subdivision from using the designation … professional engineer … as long as the designation is preceded by the word "retired" ….

Minn. Stat. §326.02 subd. 1.

Marohn is still actively engaged in his public advocacy work at Strong Towns. Marohn's speech includes publishing books, publishing materials on his website, writing opinion pieces and giving live or podcast presentations. Marohn believes that it will enhance his creditability with his audience to accurately inform his audience that he is a professional engineer without prefacing the designation with word "retired." Therefore, Marohn commenced this action seeking a declaratory judgment and an injunction against the Board from enforcing Minn. Stat. §326 subd. 1 and 3(b) against him for referring to himself as a professional engineer in his public advocacy without preceding that phrase with the word "retired." Marohn moves for summary judgment on his First Amendment as applied claim:

> (i)     The Board Cannot Sustain Enforcement of Minn. Stat. §326.02 subd. 1 and 3(b) in the Face of Marohn's First Amendment Claims under Strict Scrutiny: In order to sustain enforcement of Minn. Stat. §326.02 subd. 1 and 3(b) against Marohn's public advocacy, or anyone violating those provisions who is not engaged in providing engineering services, the Board must show enforcement is narrowly tailored to protect a compelling state

interest.  The Board has not, and cannot, show such an interest because
Marohn's public advocacy has nothing to do with providing engineering
services;

(ii)    The Board's Argument to Sustain Enforcement of Minn. Stat. §326.02
        subd. 1 and 3(b) Because it Governs "Professional Speech" Fails under
        *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018)
        ("*NIFLA*"):  In *NIFLA,* the Court held in 2018 that "professional speech"
        prohibitions are not a special category under the First Amendment – i.e.,
        those bans are subject to strict scrutiny as any other speech ban; and

(iii)   The Board's Argument to Sustain Enforcement of Minn. Stat. §326.02
        subd. 1 and 3(b) Because it Governs "Commercial Speech" Fails Because
        Marohn's Public Advocacy is not Offering a Commercial Transaction:  The
        Board argues that Marohn's public advocacy is actually commercial speech
        not subject to strict scrutiny.  However, in order to qualify as commercial
        speech, Marohn must be offering a commercial transaction in his public
        advocacy.  Marohn is not; therefore, his speech is not a commercial speech.

Marohn's motion for summary judgment should be granted.

## FACTS

### A. Background.

Marohn is a retired Minnesota licensed professional engineer, an urbanist, a land-
use planner, an author, and a public speaker. Marohn earned a bachelor's degree in civil
engineering from the University of Minnesota in 1995 and a Masters of Urban and
Regional Planning in 2004 from the University of Minnesota.  Marohn obtained a license
from the Board to practice as a professional engineer on February 8, 2000.  *Charles L.
Marohn, Jr. Declaration ("Marohn Declaration"), ¶¶2-4.*

Shortly after licensure in 2000, Marohn started his own professional planning and
engineering firm, Community Growth Institute, LLC.  Community Growth Institute, LLC
engaged in both professional planning and engineering working exclusively on behalf of
local governments.  During the next ten years, Marohn found that local governments

4

were spending monies on infrastructure projects that were a waste of money and were making the communities those local governments represented poorer. As a result, in 2009, after representing local governments as a practicing professional engineer and land-use planner, and experiencing frustration with the amount of taxpayer monies local governments wasted on transportation, infrastructure, and development projects, Marohn founded Strong Towns, a nonprofit corporation based in Minnesota that advocates for, among other reforms, local governments to spend less taxpayer dollars on construction and infrastructure projects. Marohn phased out his private practice and closed Community Growth Institute, LLC in 2012. *Marohn Declaration, ¶¶5-8.*

Strong Towns advocates an approach to urbanism that avoids the construction of unnecessary infrastructure and hence the costs of building and maintaining unnecessary infrastructure. Strong Towns provides education and information to the public, both in and out of Minnesota, in an effort to assist the public in being better advocates for appropriate infrastructure projects in their localities. Strong Towns maintains a website that provides news and commentary related to urbanism, urban planning, land-use planning, and infrastructure projects. In conjunction with his work, Marohn is also the author of *Strong Towns: A Bottom-Up Revolution to Rebuild American Prosperity*, published by Wiley & Sons in 2019 and *Confessions of a Recovering Engineer: A Strong Towns Approach to Transportation*, published by Wiley and Sons in 2021. Marohn is well known and broadly respected throughout the fields of urbanism, planning, and engineering. Marohn's work is broadly cited. *Marohn Declaration, ¶¶9-11.*

Since 2012, Marohn has not performed, or offered to perform, any engineering work the Board regulates as defined in Minn. Stat. §326.02 subd. 3. Marohn has not signed any engineering documents, prepared any plans or specifications requiring licensure, overseen anyone who practices engineering, worked on any engineering projects, or undertaken any professional action that created any threat to the health, safety, and welfare of the public. Furthermore, since 2012, Marohn has neither sought work as an engineer nor used his credentials to seek work as an engineer. Marohn's current public advocacy work does not require any type of licensure including a professional-engineering license. *Marohn Declaration, ¶¶12-15.*

## B. Marohn's Minnesota Professional-Engineering License Expires in 2018; When Marohn Becomes Aware of This, He Renews His License.

Under Minn. Stat. §326.10, the Board issues professional-engineering licenses for a period of two years. Minnesota licensed professional engineers must renew their professional-engineering licenses by June 30 each even year by submitting a renewal application and a $120 renewal fee. During this two-year period, the licensed professional engineer must attend 24 hours of certified continuing education classes in order to renew. *Marohn Declaration, ¶¶16-18.*

Because Marohn did not receive any notice reminding Marohn to renew his license before June 30, 2018, coupled with Marohn no longer practicing engineering, Marohn did not remember to renew his professional-engineering license on June 30, 2018. As a result, Marohn's professional-engineering license expired on July 1, 2018. *Marohn Declaration, ¶¶19-20.*

Marohn did not become aware that his professional-engineering license had lapsed until June 9, 2020 when another Strong Towns employee alerted Marohn that the Board's website indicated Marohn's license expired.  Presumably because licensed professional engineers frequently fail to timely renew their professional-engineering licenses, Minn. Stat. §326.10, subd. 9 provides that Minnesota professional engineers may apply to reinstate their licenses.  As Marohn had completed all of the continuing professional development hours for the 2018-2020 period in order to have a professional-engineering license reinstated, Marohn submitted an application to reinstate his license.  *Marohn Declaration, ¶¶21-24.*

In addition, because Marohn would have to renew his professional-engineering license three weeks later by June 30, 2020, Marohn simultaneously submitted his renewal application for the years 2020-2022.  In submitting his application to reinstate his professional-engineering license, Marohn also paid all fees and late fees due.  Finally, in submitting the reinstatement application, Marohn had to sign a certification stating:

> *I have not represented myself* as a[] … *professional engineer, … without proper licensure or certification*, either verbally or on any printed matter, in the State of Minnesota, nor will I do so until such time as my license or certificate has been issued by the Minnesota Board of Architecture, Engineering, Land Surveying, Landscape Architecture, Geoscience and Interior Design.

Marohn interpreted this certification to mean that Marohn had not represented himself as a professional engineer in connection with offering to provide or providing engineering services in Minnesota as opposed to engaging in public advocacy.  *Marohn Declaration, ¶¶25-26.*

The Board reinstated Marohn's professional-engineering license for 2018-2020 and issued a renewal license for 2020-2022 on or about June 19, 2020. *Marohn Declaration, ¶27.*

### C. An Engineer Files a Complaint with the Board Because Marohn Referred to Himself as a Professional Engineer While Unlicensed.

On March 5, 2020, David Dixon, an engineer living in South Dakota, filed a complaint with the Board against Marohn because Marohn had referred to himself as a professional engineer while unlicensed from July 1, 2018 through March 5, 2020. Despite the fact that the Board had received notification of the Complaint on March 5, 2020, the Board failed to notify Marohn of the Complaint until July 24, 2020 – more than one month after the Board had renewed Marohn's professional-engineering license. Dixon's complaint specifically states that it was submitted solely based on Marohn referring to himself as professional engineer in Marohn's public advocacy—protected First Amendment activity. *Marohn Declaration, ¶¶28-31.*

The Board's Complaint Committee proposed that Marohn stipulate that he violated Minn. Stat. §326.02, subd. 3(b) solely by "using the title professional engineer on his website, in publications, and in biographies for speaking engagements" while unlicensed. Furthermore, the Complaint Committee demanded that Marohn stipulate that he violated Minnesota Rules 1805.0200, subps. 1(B), 2, and 4(C) by "engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation" when Marohn signed the certification set forth above in reinstating his license certifying he had not identified himself as a professional engineer while unlicensed. *Marohn Declaration, ¶32.*

Marohn refused to agree to any resolution in which he would admit to making any false statement.  Marohn ultimately hired an attorney in an attempt to resolve the matter including meeting with the Complaint Committee.  During the meeting, members of the Complaint Committee specifically referred to Marohn's public advocacy as the grounds justifying the violation. The Complaint Committee rejected Marohn's offers to resolve the matter. *Marohn Declaration, ¶¶33-46.*

## D.  The Board Commences an OAH Proceeding Against Marohn.

The Board commenced an administrative proceeding against Marohn on June 3, 2021, OAH File No. File No. 2020-0043.  The parties filed cross motions for summary disposition on October 21, 2021.  In his motion, Marohn argued repeatedly that the Board's complaint against Marohn violates Marohn's rights under the First Amendment *as applied to Marohn because Marohn is no longer practicing as an engineer.  Marohn Declaration, ¶¶46-52.*

On May 31, 2022, the OAH issued its recommendation (the Board has final authority to issue a decision) granting the Board's motion for summary disposition.  In its recommendation, the OAH refused to rule on Marohn's *as applied* constitutional arguments.  The OAH's recommendation found that Marohn (i) violated Minn. Stat. §326.02 subd. 3 by referring to himself as a professional engineer from July 1, 2018 to June 30, 2020 while not licensed and (ii) violated Minn. Rule §1800.0200 subps. 1(B), 2, and 4(C) by falsely stating on his reinstatement application that he had not referred to himself as a professional engineer while unlicensed.  The OAH recommended Marohn be

sanctioned and the Board impose a $1,500 fine on Marohn. *Marohn Declaration, ¶¶53-54.*

Marohn submitted a letter to the Board to challenge the OAH recommendation prior to the Board's hearing on the OAH recommendation. On July 12, 2022, the Board issued its final decision affirming the OAH decision. *Marohn Declaration, ¶¶55-58.*

Marohn timely petitioned the Minnesota Court of Appeals to challenge the Board's final decision. Marohn specifically argued in his Brief and Reply Brief to the Court of Appeals his First Amendment as applied defenses to the Board's decision and argued he raised this defense before the OAH and the Board. On April 12, 2023, the Court of Appeals affirmed the Board's decision based solely on the violation of Minn. Rule §1800.0200 subps. 1(B), 2, and 4(C) (i.e., Marohn "lied" on his reinstatement certification that he never identified himself as a professional engineer while unlicensed). As a result, the Court of Appeals refused to decide any issues related to Marohn's First Amendment as applied challenges to whether the Board could enforce Minn. Stat. §326.02 subd. 3(b) against persons who identify themselves as "professional engineers" while unlicensed outside of the practice of engineering. *Marohn Declaration, ¶¶59-60.*

In 2022, Marohn placed his professional license on retired status with Board. *Marohn Declaration, ¶61.*

Marohn commenced this action to obtain a declaratory judgment providing that Minn. Stat. §326.02 subd. 1 and 3(b) are unconstitutional as applied to Marohn. More specifically, Marohn is challenging whether the Board can enforce Minn. Stat. §326.02 subd. 1 and 3(b) against Marohn because Marohn refuses in his public advocacy to add

the word "retired" anytime Marohn refers to himself as a "professional engineer."

*Marohn Declaration, ¶¶62-63.*

### E. The Board's "Interests" in Prohibiting Marohn From Identifying Himself As a Professional Engineer Without Preceding the Identification with the Word "Retired."

In responses to Interrogatories, the Board identified the following as the interests it seeks to protect in prohibiting retired engineers from identifying themselves as "professional engineers" without preceding the phrase with the word "retired:"

> the state's interests in regulating the false use of professional titles includes [i] protecting the public from unqualified practitioners, [ii] protecting the public from misleading advertisements, [iii] protecting professional titles from dilution, [iv] assuring the public that only persons who have demonstrated their qualifications and received a license can hold themselves out as a professional, and [v] maintaining the efficiency and integrity of systems of regulation of professionals by deterring people who falsely claim to be professionals before they perform work without the appropriate license or registration.

*Macron Declaration, Exhibit 22 at pp. 6-7.*

In response to Requests for Admission, the Board admitted it was not aware of any complaints of anyone falsely claiming to be a professional engineer while retired.

*Macron Declaration, Exhibit 22 at pp. 6-7.*

Marohn conducted a Rule 30 (b)(6) deposition of the Board specifically requesting the Board identify what interests it was seeking to protect the public from anyone identifying themselves as professional engineers and the harms it was seeking to avoid.

*Macron Declaration, Exhibit 23.*

The Board failed to identify any such harms. More specifically, the Board's designee repeatedly referred to the interrogatory response above which of course does not designate any harms. For instance, the Board designee testified as follows:

Q: Actually, let me strike that. What harm occurs to the public if that person is not providing any services identified in 326.02, Subdivision 3?

A: We can't -- we don't know that that person isn't going to provide them those services if they are holding out as a PE. If someone is holding out as a PE, it's presumed that they are able to practice engineering, and --

Q: Is it also presumed that they are going to do it?

A: They can do it.

Q: Well, they can do it regardless of whether they hold out as a PE, right?

A: Can they practice as a professional engineer?

Q: No. Hypothetically anybody can do those services, whether they could -- I could do them today. I wouldn't do them very well and I'd be violating the statute, but I could do them. I am just trying to figure out why the State has an interest if the person is not providing those services, and you're saying they may provide them in the future?

A: Correct, that is my answer, they may provide them in the future. There's no gatekeeping ability to say it's okay if someone holds out as a PE, that means that they are able to provide those services.

*Macron Declaration, Exhibit 23, Rule 30 (b)(6) deposition at deposition pp., 79-80.*

Likewise,

Q: In the example I cited to you of an individual speaking out at a city council meeting on an engineering project, you said the public would be harmed because they rely on the person saying they're a professional engineer. How is the wouldn't be relying on the professional engineering designation to have that person draft plans they would have to sign, right?

A: I don't know what they would rely on. I don't know what the use of PE would mean to the public in that situation. I'm not the public in that situation and I didn't observe it.

Q: No, that is fine. So you're saying you don't know how the public could rely on somebody saying they're a professional engineer at a public meeting, and because you don't know how they are going to rely on it you're not sure what the harm could be. I am asking kind of now the opposite question, I am going to limit one harm that we would agree on and see what other harms you would agree could happen, if any. If the public does not rely on that professional engineering designation, if they don't rely on that to get engineering services, to have that person draft plans or sign off on plans or do anything that is covered under the statute, how is the public harmed then?

A: What do you mean by covered under the statute?

Q: The definition that we read in Exhibit 8 on page 5, that technical definition of performing engineering services.

A: If they're holding themselves out as a PE, they are telling the public that they can do all of these things with the approval of the State of Minnesota.

12

Q: I understand that.  But if the public is not -- if anybody in the public is not going to hire the person who is speaking out at the city council meeting to do those services, how else is the public being harmed by an individual referring to themselves as a professional engineer in a public meeting, falsely saying they are a professional engineer?

A: Well, if they are holding themselves out, the public doesn't know that they're not allowed to do these things.

Q: Again, if the person never does those things, how is the public harmed?

A: How are we -- how is -- if someone is holding out as a PE, they are allowed to do those things under statute that is outlined, and the public doesn't know that they are not allowed to do that.

Q: Okay, I understand that.  How is the public harmed if the person never engages in providing engineering services as defined under Minnesota statute?

A: The public is harmed because they don't know that they are not authorized to provide these services.

*Macron Declaration, Exhibit 23, Rule 30 (b)(6) deposition at deposition pp., 39-41.*

As argued below, none of these interests involve Marohn's public advocacy. Rather, they all involve protecting the public from unqualified engineers when those engineers are practicing engineering with the one possible exception of the dilution of the professional title – which is not a *state* interest but rather an *economic* interest of professional engineers.  Of course, Marohn's public advocacy is directly threatening those economic interests which would explain why the Board, made up in part of those professional engineers, is so vociferously enforcing this title regulation.

With regard to Marohn, his interest in being able to identify himself as a professional engineer when engaged in public advocacy regarding government engineering projects is to enhance his creditability with his audience and not have to worry about whether or not he precedes the phrase "professional engineer" with the word "retired."  *Marohn Declaration, ¶¶68-75.*

## ARGUMENT

### A. Standard of Review on a Motion for Summary Judgment Under Rule 56 (c).

"Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012).

### B. Minn. Stat. §326.02, Subd. 1 and 3(b)'s Prohibition on Retired Professional Engineers from Identifying Themselves as "Professional Engineers" Without Preceding the Phrase with the Word "Retired" Is a Content-Based Speech Restriction Subject to Strict Scrutiny.

Minn. Stat. §326.02, Subd. 1 and 3(b)'s prohibitions are content-based speech regulations— laws "target[ing] speech based on its communicative content"—and are thus subject to strict scrutiny. *NIFLA*, 138 S.Ct. 2361, 2371 (2018) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Laws subject to strict scrutiny are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed,* at 163.

Narrow tailoring is a demanding standard:

> A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

*281 Care Committee v. Arneson*, 766 F.3d 774, 787 (8th Cir. 2014).

Marohn argues the only interest the Board has in licensing engineers is to ensure persons practicing engineering are competent and ethical while performing or offering to perform engineering services–what other interest could the Board have?  Minnesota

does not have an important interest - or even a legitimate interest and certainly not a compelling one - in controlling the speech of engineers when those engineers are not engaged in performing or offering to perform engineering services. Rather, the only time Marohn identifies himself as a professional engineer is while engaged in public advocacy which is at the core of First Amendment protection. *Mills v. State of Ala.*, 384 U.S. 214, 218 (1966).

Nor is the statute narrowly tailored. One easy solution for narrow tailoring would be to prohibit the use of the term "licensed professional engineer" rather than just "professional engineer." As the Fifth Circuit held in a case prohibiting anyone other than licensed interior designers from identifying themselves as "interior designers," the statute could be easily narrowly tailored by prohibiting anyone other than licensed interior designers from identifying themselves as a "licensed interior designers." *Byrum v. Landreth,* 566 F.3d 442 (5th Cir. 2009). Or, the State could limit the application of the statute to falsely claiming one is a professional engineer only when one is engaged or offering to engage in providing engineering services the Board regulates.

**C. The Board's Argument That Minn. Stat. §326.02, subd. 1 and 3(b) Regulate Professional Speech Thereby Removing These Statutes from First Amendment Protection Was Explicitly Rejected in *NIFLA*.**

In *NIFLA*, the Supreme Court held that "professional speech" is not an exception to the First Amendment free speech guarantee. 138 S.Ct. at 2371-75. The Court affirmed that "[s]peech is not unprotected merely because it is uttered by 'professionals'" and explained why professional speech is not an exception to the rule subjecting content-based restrictions to strict scrutiny. *Id*. at 2371-72.

15

Before *NIFLA*, two courts had struck down state restrictions on the use of professional titles. *Serafine v. Branaman*, 810 F.3d 354, 357-62 (5th Cir. 2016) (holding unconstitutional, as applied, a provision of a psychologist-licensing scheme that restricted the use of the title "psychologist" by an unlicensed psychologist in a political campaign); *Järlström v. Aldridge*, 366 F.Supp.3d 1205 (D. Ore. 2018) (holding unconstitutionally overbroad and thus facially unconstitutional a provision of an engineer-licensing scheme that restricted the use of the title "engineer" by unlicensed persons).

Prior to *NIFLA,* several circuit courts developed the "professional speech doctrine" holding that states could only regulate professional speech when the professional is engaged in professional conduct. *King v. Governor of New Jersey*, 767 F.3d 216, 232 (3d Cir. 2014); *Pickup v. Brown*, 740 F.3d 1208, 1227 (9th Cir. 2014). Thus, even under the now abrogated professional speech doctrine, Marohn's speech would still be subject to strict scrutiny because Marohn is speaking to the public at large.

In *NIFLA*, the Supreme Court rejected the "professional speech" doctrine overruling those courts which found ***diminished*** protection to a professional's speech *within the professional-client relationship*. 138 S.Ct. at 2371-75. In other words, *NIFLA* held that a professional's speech was entitled to full First Amendment protection even when the professional was engaged in professional conduct and subjected any content-based restriction, such as those contained in Minn. Stat. §326.02 subd. 3(b), to strict scrutiny.

The Board's interest in regulating the titles state licensees use is patently unconstitutional as applied to Marohn because Marohn is not using the title while

engaged in conduct the Board regulates – the practice of engineering. Although the Board may have an interest in regulating the use of professional titles by those practicing engineering, the Board does not have any interest–much less a compelling one–in controlling the use of titles in other contexts.

The Board has previously argued that it has an interest in ensuring, for instance, that a non-physician could lend an air of creditability to publishing dangerous medical advice by stating he is a licensed physician.  First, Marohn is not a "non-engineer" – he is simply unlicensed.  Marohn has a degree in engineering and practiced as a professional engineer for 12 years and maintained his license for 20 years.  Second, Marohn is not publishing materials offering technical engineering advice on, for instance, how many rivets to use in constructing a bridge.  Marohn's advocacy is related to whether or not the bridge should be built or how much a government should spend on building the bridge. Using the Board's example, non-physician's can certainly advocate for reducing the cost of medical services.

### D. The Board's Argument that it Can Enforce Minn. Stat. §326.02 subd. 1 and 3 In Order to Prevent Marohn From "Lying" is Prohibited Under *United States v. Alvarez*, 567 U.S. 709 (2012).

The Board argues that it may enforce Minn. Stat. §326.02 subd. 1 and 3(b) in order to prohibit Marohn from "lying" to the public that he is a professional engineer simply because he is "unlicensed"–an argument directly at odds with *United States v. Alvarez*, 567 U.S. 709 (2012). In *Alvarez*, a candidate for public office falsely claimed during his political campaign to have won the Congressional Medal of Honor and was subsequently under the Stolen Valor Act, a law prohibiting falsely claiming to have won

a military decoration. *Id*. at 716, 730. The defendant/candidate admitted that he flat-out lied about having won the medal during his campaign but did so nonetheless to enhance his creditability and electability with the voters. *Id*. at 714, 715. *Alvarez* reversed his conviction and struck down the law as a content-based speech restriction. *Id*. at 716-18, 722, 729-30.

*Alvarez* held that false speech is not an exception to the application of strict scrutiny and affirmed that, outside of narrow exceptions such as fraud and defamation, a prohibition on speech because of its falsity is just another content-based speech restriction subject to strict scrutiny.

Absent from those few categories excepting First Amendment protection is false statements in public advocacy. This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee. *Id*. at 718.

Furthermore, the Board's argument that Marohn would be misleading or lying if identified himself as a "professional engineer" without preceding these words with the word "retired" is not really accurate–as the Fifth Circuit specifically found in *Serafine* where an unlicensed psychologist identified herself as a psychologist in her political campaign for public office. As *Serafine* held, the psychologist, while unlicensed, was still a trained psychologist who actually had taught psychology at the college level and had published articles in psychological journals. *Serafine*, at 362.

Similarly to *Serafine*, Marohn practiced as a professional engineer for 12 years

18

and was licensed by Minnesota for 22 years. Marohn identifying himself as a professional engineer outside the context of providing engineer services, and particularly when engaged in public advocacy, is not misleading–he was in fact a "professional engineer."

*Alvarez* itself has suggested a solution to the Board's alleged problem. Under strict scrutiny, the statute at issue must be "narrowly tailored" to serve the State's interests. *Alvarez* held that rather than criminalizing falsely stating that one had been awarded the Medal of Honor, the Department of Defense could simply post on its website a list of Medal of Honor recipients. Here, the Board had already done that. The Board's website has a searchable list of all engineers whom the Board has licensed and the states the current status of the license. *Marohn Declaration, ¶80.*

The Board has also previously argued that *Alvarez* should not be applied to Marohn's claims because Marohn identifies himself as a professional engineer in books he has published and seminars he has given and for which either Marohn or Strong Towns receives money for the book or seminar. The Board relied on a bare statement in *Alvarez'* plurality opinion regarding "speech used to gain a material advantage." *Id.,* at 723. However, this statement was made in discussing trademark violations or frauds where any material gain is coupled with a legally cognizable injury as the concurrence found:

> [M]any statutes and common-law doctrines make the utterance of certain kinds of false statements unlawful. Those prohibitions, however, tend to be narrower than the statute before us, in that they limit the scope of their application, sometimes by requiring proof of specific harm to identifiable victims; sometimes by specifying that the lies be made in contexts in which a tangible harm to others is especially

likely to occur; and sometimes by limiting the prohibited lies to those that are particularly likely to produce harm.

***

While this list is not exhaustive, it is sufficient to show that few statutes, if any, simply *prohibit without limitation the telling of a lie*, even a lie about one particular matter. Instead, in virtually all these instances limitations of context, requirements of proof of injury, and the like, narrow the statute to a subset of lies where specific harm is more likely to occur. The limitations help to make certain that the statute does not allow its threat of liability or criminal punishment to roam at large, discouraging or forbidding the telling of the lie in contexts where harm is unlikely or the need for the prohibition is small.

*Alvarez*, 567 U.S. at 734, 736 (emphasis supplied).

Therefore, read in context, the phrase "material advantage" as used is meant to be a synonym for fraud or injury-causing lie–as *Alvarez'* concurrence held.  Purchasers of Marohn's books could not rescind the purchase because Marohn (accurately) claimed he was a professional engineer although unlicensed because his background is not material to the transaction.  Moreover, the Board has no interest in ensuring that those who hear Marohn's views on public advocacy issues know the status of Marohn's current licensure status with the Board when hearing Marohn's views.  As *Alvarez* held to allow such a "freewheeling" approach to the Board's jurisdiction over persons identifying themselves as professional engineers "would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition."  *Alvarez*, at 723.

### E.  Marohn's Public Advocacy Is Not Commercial Speech.

#### 1.  Commercial Speech is Now Subject to Strict Scrutiny Under *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015).

In *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015), the Court held that any "content based" speech restrictions are subject to strict scrutiny - period.  *Reed, at 163-*

20

*164.* A regulation is "content based" if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Relying on this, the Sixth Circuit in *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 703–08 (6th Cir. 2020) held that *Reed* implicitly overruled the commercial speech doctrine under *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980). While the Eighth Circuit has not yet ruled on this precise issue, Marohn argues that *Reed* requires that Minnesota's "professional engineering" speech restriction must be subject to strict scrutiny because it is content based. It literally applies to specific speech saying one is a professional engineer.

### 2. Marohn Identifying Himself as a Professional Engineer Without Preceding the Phrase with the Word "Retired" Is Not "Commercial Speech."

Prior to *Reed, Cent. Hudson*, 447 U.S. 557, 561–62 (1980) (emphasis supplied) that commercial speech is speech which "*proposes* a commercial transaction" or an "expression related *solely* to the economic interests of the speaker and its audience."

Indeed, the term "commercial speech" is something of a misnomer: the doctrine is really an advertising-speech or marketing-speech doctrine. *Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 482 (1989); *Seabolt v. Texas Bd. of Chiropractic Examiners*, 30 F. Supp. 2d 965, 967 (S.D. Tex. 1998) (characterizing *Central Hudson* as "announc[ing] a four-part framework for analyzing *advertising restrictions* under the First Amendment" (emphasis added)).

The Supreme Court recently alluded to this issue in an analogous situation. In *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), a commercial website designer filed an as

21

applied challenge to Colorado's antidiscrimination statute based on the designer's refusal to design wedding websites for homosexual couples. Applying strict scrutiny, *303 Creative LLC* found Colorado's antidiscrimination statute violated the designer's free speech rights. *303 Creative LLC* specifically rejected any argument that because the designer was paid the designer's claim was not subject to strict scrutiny stating:

> Of course, as the State emphasizes, Ms. Smith offers her speech for pay and does so through 303 Creative LLC, a company in which she is "the sole member-owner." *Id.*, at 181a; see also *post*, at 2339 – 2340 (opinion of SOTOMAYOR, J.) (emphasizing Ms. Smith's "commercial" activity). But none of that makes a difference. Does anyone think a speechwriter loses his First Amendment right to choose for whom he works if he accepts money in return? Or that a visual artist who accepts commissions from the public does the same? Many of the world's great works of literature and art were created with an expectation of compensation. Nor, this Court has held, do speakers shed their First Amendment protections by employing the corporate form to disseminate their speech. This fact underlies our cases involving everything from movie producers to book publishers to newspapers.

*Id.,* at 594.

This court dealt with whether speech was commercial in an analogous case. *Dryer v. Nat'l Football League*, 55 F. Supp. 3d 1181 (D. Minn. 2014), *aff'd*, 814 F.3d 938 (8th Cir. 2016). In *Dryer,* former professional football players sued the NFL alleging that the NFL's use of video footage of players in television productions on the history of the NFL violated their publicity rights, caused consumer confusion, and unjustly enriched the league. *Dryer* adopted a three-pronged test for commercial speech, as set forth in *Porous Media Corp. v. Pall Corp.*: *"*whether the speech is an advertisement, whether it refers to a specific product, and the speaker's economic motivation for the speech." 173 F.3d 1109, 1120 (8th Cir.1999) (citing *Bolger v. Youngs Drug Prod. Corp.,* 463 U.S. 60 (1983); *Dryer* at 1189. *"*None of these factors, standing alone, renders the speech at issue

commercial, but the 'combination of all these characteristics, however, provides strong support' for the conclusion that the speech is commercial." *Id.; Bolger*, 463 U.S. at 66.

*Dryer* found that NFL highlight films were not commercial speech, in part, because the films were of independent value and public interest, in and of themselves, such that the NFL's economic motivations could not alone convert them into commercial speech. While there is an economic interest in the incidental sense that either Strong Towns or Marohn has earned money from events or books in which Marohn calls himself a professional engineer, this interest is by far subordinate to his public advocacy message and only serves to directly augment his advocacy. As *Dryer* noted, "[t]his proposition is self-evident: that movies, books, or other expressive works 'are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.'" *Id.* at 1193 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952)). To hold that Marohn's speech is commercial is to invite absurdity into jurisprudence, as essentially anything a professional engineer does in the public sphere, related to his professional capacity or not, would be subject to commercial speech regulation.

Cases the Board has previously cited to argue that Minn. Stat. §326.02 subd. 1 and 3(b) regulate commercial speech as applied to Marohn's public advocacy or otherwise outside of practicing engineering are easily distinguishable. Both *Ohralik v. Ohio State Bar Ass'n*, 98 S. Ct. 1912 (1978) and *Ibanez v. Florida Dept. of Bus. & Prof'l Regulation, Bd. of Accountancy*, 114 S. Ct. 2084 (1994) involved attorneys soliciting business for their law firms. *Maceluch v. Wysong*, 680 F.2d 1062 (5th Cir. 1982) involved osteopaths

using "M.D." to advertise their osteopath business. *Accountant's Soc. of Virginia v. Bowman*, 860 F.2d 602 (4th Cir. 1988) limited the use of the term "public accountant" to certified public accountants in an action against a non-certified public accountant who advertised as a "public accountant" in her accounting business. *Van Breeman v. Dep't. of Prof'l. Regulation,* 694 N.E.2d 688 (Ill. Ct. App. 1998) prohibited an unlicensed professional engineer from acting as an expert forensic engineering witness when a licensing statute required licensure of forensic engineers. *Seabolt v. Texas Bd. of Chiropractic Examiners*, 30 F. Supp. 2d 965, 966 (S.D. Tex. 1998) involved a chiropractic practitioner who wanted to use the word "physician" in advertising his chiropractic practice. None of these cases involved the use of a regulated professional identification occurring outside of engaging in the practice of the regulated profession.

The Board has also argued that Marohn identifying himself as a professional engineer "advertises to the public the ability to buy goods or services associated with the name." The problem here of course is that Marohn is not selling goods or services – he is advocating that governmental entities spend too much money on engineering projects. This is core public speech. The Board further argues that Marohn identifying himself as a professional engineer in connection with his public advocacy "has the potential to mislead the public by implying a quality or credential not present." What is left unsaid is to what purpose would Marohn be directing his "quality or credential not present." It is not provide or offer to provide engineering services. Rather, it is to convince listeners of his public advocacy opinions.

The Board has also relied on *Friedman v. Rogers*, 440 U.S. 1 (1979) for the proposition that a state may regulate the use of a tradename. However, *Friedman* involved the use of a tradename to promote an optometry practice (and thus a business), not the use of a professional title in public speech. *Id.,* at pp. 3-6, 8, 11, n.10. Indeed, *Friedman* itself used the proposes a business transaction test to determine that use of a tradename was commercial speech and thus entitled to reduced First Amendment protection: "the trade name is used as part of a proposal of a commercial transaction." *Id*. at 11; *see also id*. at 11 n.10 (distinguishing an advertisement that "'did more than simply propose a commercial transaction'" (quoting *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975)), from "the mere solicitation of patronage implicit in a trade name"). Any reliance by the Board on *Friedman* without acknowledgment of the test that *Friedman* actually used is, to put things mildly, less than entirely forthright.

Instead of *Friedman*, this court should rely on *Serafine*. In *Serafine*, the plaintiff had been a candidate for office who "described herself as a 'psychologist' on her campaign website." *Id.,* at 357. The Texas State Board of Examiners of Psychologists ordered her to stop describing herself as a "psychologist" because she was not a licensed psychologist. *Id*. The Fifth Circuit held that the prohibition on using the title "psychologist" without being licensed was unconstitutional as applied to the plaintiff because she used it in political speech, not commercial speech. *Id*. at 360-62. Minnesota's restriction on the use of the title "professional engineer" is, for the same reason, unconstitutional as applied to Marohn because Marohn is engaged in public advocacy and not offering to practice engineering.

25

Outside of advertising or marketing, the commercial-speech doctrine does not control—*Alvarez* controls, allowing people to tell big whopping lies about their credentials. And because the false speech in *Alvarez* was protected, Marohn's speech is protected a fortiori. The Board does not even assert that Marohn characterized himself as a "professional engineer" in an attempt to market his services as a professional engineer, or, indeed, to market *anything*. The Board thus fails to present even a colorable argument that Marohn's speech was commercial.

When Marohn made the statements characterizing himself as a professional engineer, he did so outside of any effort to market or perform his engineering services— indeed, he made them in the course of public advocacy. The statements were thus fully protected. As applied to Marohn's speech, §326.02, subd. 1 and 3(b) are subject to strict scrutiny and are unconstitutional.

### 3. Even if Marohn Identifying Himself as a Professional Engineer Without Preceding the Phrase with "Retired" Is Commercial Speech, the Board Still Cannot Sustain the Regulation.

Even if the Court finds Marohn's identification of himself as a professional engineer is commercial speech, such a finding does not get the Board off the hook.

"Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571–72 (2011). To sustain the targeted, content-based burden imposes on protected expression, the State has the burden to sustain the statute under intermediate scrutiny - that the statute *directly* advances a *substantial* governmental interest and that the statute

is drawn to achieve that interest.[1] *Id.* There must be a "fit between the legislature's ends and the means chosen to accomplish those ends." *Id.* As in other contexts, these standards ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message. *Id.* The government bears the burden of proving that the commercial speech regulation it has imposed is justified, and that it has crafted its regulation so as to separate "the harmless from the harmful." *Fox*, 492 U.S. 469, 480 (1989).

The Eighth Circuit has held that:

in order to satisfy the third *Central Hudson* prong, the [Statute] must advance its substantial interest "in a direct and material way." This burden "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." The Statute "may not be sustained if it provides only ineffective or remote support for the government's purpose." Instead, the Statute [must] "significantly reduce[]" the alleged harms. This requirement is "critical; otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'

*Missouri Broadcasters Ass'n v. Schmitt*, 946 F.3d 453, 460 (8th Cir. 2020).

Here, the Board has not demonstrated it has any interest in regulating the phrase "professional engineer" outside the context of engaging or offering to engage in providing engineering services. In the Rule 30 (b)(6) deposition, the best the Board's designee could testify as to what harm would occur if Marohn identify himself as a professional engineer at a public conference is that persons hearing Marohn may hire him in the future. That harm is inherently speculative under *Schmitt*.

---

[1] As set forth above, the Sixth Circuit has interpreted this language to mean the restriction is subject to strict scrutiny. The above analysis assumes intermediate scrutiny applies.

## CONCLUSION

Marohn's summary judgment motion should be granted.

Dated: October 15, 2025

*/s/William F. Mohrman*
William F. Mohrman, #168816
Mohrman, Kaardal & Erickson, P.A.
150 South 5th Street, Suite 3100
Minneapolis, MN 55402
Telephone: 612-341-1074
Facsimile: 612-341-1076
Email: mohrman@mklaw.com
*Attorneys for the Plaintiff Charles L.*
*Marohn, Jr.*