UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Charles L. Marohn, Jr.,                                 Case No. 23-CV-03717 NEB-LIB

              Plaintiff,

     vs.                                           **DEFENDANTS' MEMORANDUM
OPPOSING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

The Minnesota Board of Architecture,
Engineering, Land Surveying,
Landscape Architecture, Geoscience,
and Interior Design, et al.

              Defendants.

Plaintiff Charles Marohn seeks summary judgment on his claim that Defendants the

Minnesota Board of Architecture, Engineering, Land Surveying, Landscape Architecture,

Geoscience and Interior Design and its members would violate his First Amendment rights

by sanctioning him for falsely claiming to be a professional engineer. The Court should

deny Marohn's motion. The First Amendment does not protect false claims of professional

licensure. And even if it did, prohibitions against such speech serve important public-safety

purposes and satisfy intermediate and strict scrutiny.

## FACTS

Marohn is a former professional engineer who has since retired his license.

Minnesota law prohibits him from referring to himself as a professional engineer when he

does not have an active professional-engineer license. Because Marohn challenges this

prohibition, the Board begins by explaining the history of, and reasons for, the prohibition

before turning to Marohn's uses of the professional engineer designation.

1

***Minnesota's Interests in Limiting Usage of the Professional Engineer Title***

Engineers have responsibilities with significant public safety implications. (Doc. 48, ¶ 3.) While the specifics vary from practice area to practice area, in general engineers are responsible for ensuring that buildings and other structures will be safe for the people using them. (*Id.*) For example, engineers are responsible for ensuring that a building's structural supports will bear the load of the structure, that a building will not succumb to natural phenomena like wind forces, and that a building's electrical systems will meet load requirements. (*Id.*)

To protect the public from unqualified practitioners, states began licensing professional engineers at the turn of the twentieth century. *See, e.g.*, Wyo. Comp. Stat. Ann. § 874, at 289–290 (1910) (establishing first requirement in county for engineering licensure).[1] Minnesota began requiring a license to practice professional engineering in 1921. 1921 Minn. Laws ch. 523, 983–90. Along with regulating who can practice professional engineering, Minnesota also prohibits people from referring to themselves as professional engineers (or using any other representation that would lead the public to believe that the person was a professional engineer) unless they have an active professional engineer license. Minn. Stat. § 326.02, subd. 3.

Prohibiting unlicensed people from falsely claiming to be professional engineers serves multiple purposes. Most obviously, these prohibitions protect public safety by

---

[1] Available at https://www.google.com/books/edition/Wyoming_Compiled_Statutes_Annotated_1910/5MAwAQAAMAAJ. For the Court's convenience, the cited excerpt is also included as an exhibit to the Declaration of Allen Barr. (Doc. 59-7.)

preventing people whose qualifications have not been determined through the licensure process from practicing. (Doc. 60, ¶ 5; Doc. 60-12, at 21:18–22:1.) And, to serve that overarching interest, Minnesota also has interests in ensuring that members of the public can determine whether someone is qualified to practice professional engineering, and as well as in deterring unlicensed practice before it occurs. (Doc. 60, ¶¶ 5–6, 11–13.)

For members of the public to know whether they are hiring a qualified individual, there must be some method of distinguishing licensed individuals from the general public. (*Id.* ¶ 6.) That method is prohibiting non-licensees from referring to themselves as professional engineers. (*Id.* ¶¶ 6–7.) If anyone can use the title, it ceases to be meaningful for determining whether someone is qualified to practice. (Doc. 60-12, at 24:19–25:2, 82:16–83:5, 90:9–91:1.)

While checking licensure on the Board's website is theoretically possible, the public does not always do so. (Second Van Etta-Olson Decl. ¶ 4.) Instead, in multiple instances people have let their license expire, continued to call themselves professional engineers, and then proceeded to perform work for clients who did not confirm the individual's licensure status with the Board. (Docs. 60-8, 60-9; Second Van Etta-Olson Decl. ¶¶ 5–6.)

Relatedly, Minnesota aims to deter unlicensed practice before it occurs. (Doc. 60, ¶¶ 5, 11–13; Doc. 60-12, at 79:19–80:4, 82:16–83:5, 90:9–91:1.). One method of achieving this goal is by prohibiting unlicensed people from holding themselves out as professional engineers in the first place. (Doc. 60, ¶¶ 5, 11–13.) And public safety requires that the Board be able to do so before such individuals carry through with designing plans.

Moreover, if someone can avoid discipline by disclaiming an intent to practice, then unscrupulous (and unlicensed) engineers would just make such a disclaimer when interacting with the Board's investigator, but then proceed to practice engineering when interacting with clients. For example, even after he stopped practicing, Marohn has repeatedly been approached to perform professional engineering work. (Doc. 59-1, at 101:25–102:17.) Those potential clients discovered Marohn would not practice professional engineering only because he told them so. (*Id.* at 103:20–104:3.) While Marohn may have honestly told his clients he was not practicing, not everyone is as honest. The Board, of course, has no way of knowing whether an unlicensed person who claims to be a professional engineer would turn down professional engineering work when asked to do it. (Doc. 60, ¶ 11.) As a result, limiting enforcement to individuals who carry through with practicing would significantly impair the Board's ability to deter unlicensed work.

**Marohn's Use of the Professional Engineer Title**

Marohn used to be a professional engineer, although he was inconsistent about renewing his license over the years. (Doc. 60, ¶ 2.) In 2021, the Board fined Marohn $1,500 for holding himself out as a professional engineer while unlicensed and then denying having done so when he finally renewed his license.[2] (Doc. 60-1, at 10–11.) In 2022,

---

[2] Marohn makes several statements regarding this disciplinary proceeding that, while immaterial to this case, are incorrect. First, the Board's complaint committee did send him two notices regarding its investigation before he renewed his license. (Second Van Etta-Olson Decl. Exs. 1A–1B.) Second, the ALJ in Marohn's case did not recommend a civil penalty; the Board determined it in the first instance. (*See generally* Doc. 60-1, at 7–16); *see also Padilla v. Minn. State Bd. of Med. Exam'rs*, 382 N.W.2d 876, 887 (Minn. Ct. App. 1986) (holding ALJs generally lack authority to determine discipline). Finally, Marohn discusses his settlement discussions with the Committee in detail. (Doc. 56, ¶¶ 35–45;

Marohn switched his license to retired status. (Doc. 60, ¶ 2) Under that status, he cannot practice, but he can describe himself as a "retired professional engineer" or any other phrase that does not indicate active licensure. *Id.*, subd. 3(b).

Marohn is the president of Strong Towns, an organization that advocates regarding local government land use, capital investment, and community development. (Doc. 1, ¶ 3; Doc. 1-1, at 14.) In that role, he is paid to write articles, give presentations, and create online courses that Strong Towns then sells to the public. (Doc. 60, ¶ 4; Docs. 60-2 to 60-6; Doc. 59-1 at 66:15–75:15.) That content includes topics that are related to engineering. (Doc. 59-1, at 123:7–20.) Since 2012, Strong Towns has received more than $2,000,000 for events, webinars, and ticket sales. (Doc. 59-5.) Marohn receives an approximate $185,000 annual salary from Strong Towns for this work. (Doc. 59-1, at 67:22–23.) Marohn has also written several books, for which he receives royalties. (Doc. 59-6.) Since 2020, Marohn has earned over $75,000 in royalties for these books. (*Id.*)

In these books, articles, presentations, and courses, Marohn wishes to say that he is a professional engineer. (Doc. 59-4, at 4–5) Marohn admits that he wants to do so to increase his credibility with his audience. (Doc. 55 at 13.) And the compensation he receives for his writings and speaking engagements are a significant source of Strong Town's funding for salary. (Doc. 59-5.) Based on the topics on which Marohn opines, he believes that his opinions may carry less weight if he is not perceived as a professional engineer. (Doc. 59-1, at 123:5–124:1.)

---

Docs. 56-4 to 56-11.) Those discussions are inadmissible and should not be considered by the Court. Fed. R. Evid. 408(a); Fed. R. Civ. P. 56(c)(2).

Marohn acknowledges that "professional engineer" conveys that someone possesses a professional engineer license. When asked what "professional engineer" meant, Marohn stated it was "personally something I had accomplished. . . . I was like one of a handful of people in the state, in the country, who could say they were a licensed engineer." (*Id.* at 93:2, 93:13–18.) He acknowledged that "having PE behind your name" demonstrates that someone has "gone through the licensing process." (*Id.* at 121:15, 20–22.) He also equated getting his license with becoming a professional engineer. (*Id.* at 104:18–21.)

***Procedural History***

Marohn sued the Board and its members to enjoin them from taking action if he makes representations that would lead the public to believe that he is a professional engineer. (Doc. 1, at 22.) He raises an as-applied First Amendment challenge to Minn. Stat. § 326.02, subd. 3—which prohibits false licensure claims.[3] (*Id.* ¶¶ 65–69.)

## ARGUMENT

Summary judgment is proper only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Courts must view evidence in the light most favorable to the nonmoving party. *Spaulding v. Conopco, Inc.*, 740 F.3d 1187, 1190 (8th Cir. 2014). State statutes are presumed constitutional. *Brason v. O.F. Mossberg & Sons, Inc.*, 221 F.3d 1064, 1065 n.4 (8th Cir. 2000). And before the Board has any burden to justify impingements on First Amendment interests, Marohn must first show that undisputed facts make the First Amendment

---

[3] The Court previously dismissed Marohn's claim that the Board retaliated against Marohn for engaging in protected speech. (Doc. 29, at 13.)

applicable to his false licensure claims. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

The Court should deny Marohn's summary judgment motion because Minnesota's prohibition on falsely claiming to be a professional engineer as-applied to Marohn does not violate his First Amendment rights for two independent reasons. First, the First Amendment does not protect Marohn's false licensure claims. Second, prohibiting Marohn from falsely claiming to be a professional engineer satisfies intermediate and strict scrutiny. Even if Marohn's speech is protected by the First Amendment, the prohibition thus does not violate his rights.

## I.    THE FIRST AMENDMENT DOES NOT PROTECT MAROHN'S FALSE LICENSURE CLAIMS.

As discussed in the Board's memorandum supporting its motion for summary judgment, Marohn's speech falls into several categories of speech that are unprotected by the First Amendment: false commercial speech, fraudulent speech, and false licensure claims. (Doc. 47, at 11–20.) Marohn asserts that the commercial- and professional-speech doctrines do not allow Minnesota to prohibit false licensure claims. Neither argument has merit because Marohn's speech is commercial and the Board has not raised or relied on the professional speech doctrine. Even if Marohn were correct on both arguments, however, Marohn's speech also falls into two other categories of speech unprotected by the First Amendment: fraudulent speech and false licensure claims. As a result, Minnesota's prohibition on falsely claiming to be a professional engineer, as-applied to Marohn, is constitutional.

A.    **Marohn's False Licensure Claims Are False Commercial Speech That Is Unprotected by the First Amendment.**

Commercial speech receives less First Amendment protection than noncommercial speech, and false commercial speech is entirely unprotected. *Zauderer v. Ofc. Of Disciplinary Counsel of the Ohio Sup. Ct.*, 471 U.S. 626, 637 (1985); *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002). As explained in the Board's brief supporting summary judgment, Marohn's false licensure claims are such speech. (Doc. 47, at 11–14.) Licensure claims are inherently commercial speech. *Ibanez v. Fla. Dep't of Bus. & Pro. Reg., Bd. of Acct.*, 512 U.S. 136 (1994). And even if they were not inherently commercial speech, Marohn's specific statements are because they constitute an advertisement used to promote specific goods or services for which Marohn has an economic motivation. Marohn's arguments to the contrary are meritless.

1.    **The Supreme Court has not implicitly overruled its commercial speech jurisprudence.**

The First Amendment does not protect misleading commercial speech. *Thompson*, 535 U.S. at 367. Marohn first argues that this commercial-speech doctrine no longer exists and therefore regulation of commercial speech is now automatically subject to strict scrutiny. (Doc. 55, at 21.) The Supreme Court has not overruled this longstanding doctrine.

Marohn cites two cases to claim the reduced protections for commercial speech no longer exist. Neither supports his claim. Marohn first cites *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), to argue that all content-based speech restrictions are subject to strict scrutiny. But that case did not involve commercial speech; it addressed three types of non-commercial outdoor signs: "ideological signs," "political signs," and "temporary

directional signs." *Id.* at 159–60. The Court did not discuss the commercial speech doctrine at all, let alone address whether to depart from stare decisis with respect to a fifty-year-old doctrine. *See Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976) (recognizing lack of protection for false commercial speech); *see also Carmell v. Texas*, 529 U.S. 513, 538 (2000) (recognizing the Supreme Court "does not discard longstanding precedent" in cases that do "not even implicate, let alone purport to overrule" that precedent). Moreover, post-*Reed*, both the Supreme Court and the Eighth Circuit have continued to recognize the reduced First Amendment protections applicable to commercial speech. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018); *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 701 (8th Cir. 2021) ("*Central Hudson* . . . provides the test for analyzing the constitutionality of laws burdening commercial speech.").

Marohn next relies on the Sixth Circuit's decision in *International Outdoor, Inc. v. City of Troy*, 974 F.3d 690 (6th Cir. 2020). (Doc. 55 at 21.) That case, of course, is not binding on this Court. Moreover, although the Sixth Circuit held that the reduced scrutiny for commercial speech was only applicable to content-neutral regulations, *International Outdoor* itself recognized that it was in the minority. *Id.* at 703–05. The court highlighted that, notwithstanding *Reed*, four circuits had reaffirmed the *Central Hudson* standard's continued application to commercial-speech regulations. *Id.* at 703–05. Indeed, the Third Circuit recently recognized that *Reed* was of "little relevance" to commercial speech and "did not implicate the commercial-speech doctrine." *Steven A. Conner, DPM, P.C. v. Fox Rehab. Servs., P.C.*, No. 23-1550, 2025 WL 289230, at *6 (3d Cir. Jan. 24, 2025). This

Court should join the majority of circuits and hold that *Reed* did not alter states' authority to regulate commercial speech.

### 2. Marohn's false licensure claims are commercial speech.

Marohn next argues that if the commercial speech doctrine still exists, his false licensure claims are not commercial speech. (Doc. 55, at 21–26.) But as discussed in the Board's principal brief, using a professional title is commercial speech. (Doc. 47, at 11.) And, as recognized by the Eleventh Circuit, this remains true even when the speaker is not seeking a commercial relationship. *Abramson v. Gonzalez*, 949 F.2d 1567, 1574 (11th Cir. 1992).

Marohn attempts to distinguish *Ibanez* and other cases on the theory that they do not involve using a professional identification outside of practicing in the regulated profession. (Doc. 55, at 24.) Not so. *Ibanez* concerned using a "certified public accountant" designation (the regulated profession) to promote a law practice (a profession not regulated by the state agency sued in that case). 512 U.S. at 138. And the plaintiffs in *Abramson* wished to refer to themselves as psychologists "at cocktail parties or over private dinners." 949 F.2d at 1574. Similarly, the accountants in *Accountant's Society of Virginia v. Bowman* only sought to use the "public accountant" designation in connection with *non*-public accounting services.[4] *See* 860 F.2d 602, 605 (4th Cir. 1988). And in *Seabolt v. Texas Board*

---

[4] Unlike more general accounting (which includes things such as bookkeeping, payroll, and tax preparation), public accounting refers to a specific type of practice in which an accountant attests to the accuracy of financial statements. *See Accountant*, BLACK'S LAW DICTIONARY (14th ed. 2024); *see also, e.g.*, Minn. Stat. § 326A.10(a) (prohibiting non-CPAs from issuing reports on financial statements that result from providing attest services).

*of Chiropractic Examiners*, chiropractors sought to use "physician" to advertise their *non-*physician chiropractic practice. 30 F. Supp. 2d 965, 968 (S.D. Tex. 1998) (endorsing argument that "in common parlance the term 'physician' is understood to mean medical doctor"). Thus, the speakers in these cases, like Marohn, sought to use a professional identification outside of engaging in the practice of the regulated profession.

Even if these analogous cases do not resolve the issue, the Eighth Circuit's three commercial-speech factors establish that Marohn's speech is commercial. Those factors are (i) whether the communication is an advertisement, (ii) whether it refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech. *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1120 (8th Cir. 1999). Marohn's statements are an advertisement because he is admittedly using them to sell his books and courses, as well as events for which he receives a salary. Marohn's statements refer to specific products and services, specifically the opinions in the media he is selling and his qualifications to give those opinions. And Marohn has an economic motivation for the false statements because he or Strong Towns profits from the purchase of his books and courses.

Marohn cites *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) to rebut the proposition speech made for compensation automatically avoids strict scrutiny. (Doc. 55, at 22.) This is a strawman argument because the Board has never argued that it can regulate Marohn's claims of licensure merely because (in some instances) he is paid for speech that includes those claims.

Instead, the contrast between this case and *303 Creative* shows why regulating his false licensure claims is permissible. In *303 Creative*, the state sought to regulate the

substantive speech for which the speaker was paid. 600 U.S. at 589. The Board, in contrast, is not seeking to regulate the substance of Marohn's books or courses, only how he represents his licensure to promote those materials. If the website designer in *303 Creative* had promoted her business by falsely saying (for example), "I invented Facebook," nothing in *303 Creative* suggests the state could not take action for that false promotion. The same is true here. Although *303 Creative* might prevent the Board from taking action against Marohn for claiming that a certain interchange design is dangerous or wasteful (something the Board has never even contemplated doing), it does not prevent the Board from taking action against him for falsely advertising, "These books contain the opinion of a professional engineer."

Marohn cites *Dryer v. National Football League* 55 F. Supp. 3d 1181 (D. Minn. 2014), *aff'd*, 814 F.3d 938 (8th Cir. 2016), for the proposition that speech of independent value and public interest is not commercial speech, even if made with commercial motivations. (Doc. 55, at 22–23.) He reads far too much into the case. *Dryer* applied the Eighth Circuit's three commercial-speech factors to films describing significant NFL games, players, and seasons that allegedly violated players' publicity rights. *Id.* at 1186, 1189.

*Dryer* is distinguishable for at least three reasons. First, the *Dryer* court recognized that the case was unique because it concerned a conflict between private rights and did not involve a government regulation. *Id.* at 1188. This case, in contrast, involves government regulations, not competing private rights. Second, the ultimate purpose of Marohn's false licensure claims is to promote *other* substantive speech. Marohn wants to call himself a

professional engineer to increase his credibility. That will in turn make people more likely to listen to—and therefore pay for—Marohn's publications. Those payments result in commercial gain for Marohn. The *Dryer* films, on the other hand, were themselves the publications at issue; they were not promoting some other (available for purchase) media. *Id.* at 1191. Third, unlike *Dryer*, Marohn's false claims are not integral to Marohn's message. *Dryer* recognized that it was impossible for the NFL to make "a visual recounting of a significant football game or the season of a particular football team without the use of footage of NFL players playing in those games." *Id.* at 1192. Marohn, however, can make his substantive points about the benefits or drawbacks of various policy decisions without also claiming to be a professional engineer.

Marohn also relies heavily on the Fifth Circuit's decision in *Serafine v. Branaman*, which held that a politician's false use of the psychologist title was not commercial speech. 810 F.3d 354, 361 (5th Cir. 2016); (Doc.55, at 25). *Serafine* is readily distinguishable and was also wrongly decided. The *Serafine* plaintiff was not using the professional title to obtain commercial advantage. Marohn is. He wants to claim to be a professional engineer so that more people will listen to him, and that in turn leads to the commercial advantage of additional book and course purchases. Nor did *Serafine* even attempt to engage with the Supreme Court's recognition in *Ibanez* that the use of professional designations is commercial speech. *Ibanez*, 512 U.S. at 142. That failure led the *Serafine* court to reach an incorrect result.

### 3.   Prohibiting Marohn's false commercial speech is not subject to any scrutiny under the First Amendment.

Marohn lastly argues that, even if his licensure claims are commercial speech, Minnesota's prohibition is subject to intermediate scrutiny. (Doc. 55, at 26–27.) But false commercial speech like Marohn's is not subject to any scrutiny under the First Amendment. Thus, as-applied to Marohn, Minnesota's prohibition on such speech is constitutional.

The First Amendment does not protect misleading commercial speech. *Thompson*, 535 U.S. at 367. And if a prohibition does not impact First Amendment rights, then it is not subject to First Amendment scrutiny, strict, intermediate, or otherwise. *Miller v. Thurston*, 967 F.3d 727, 738–39 (8th Cir. 2020). Both cases Marohn cites for the intermediate scrutiny standard dealt with truthful commercial speech and are therefore not on point. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 579 (2011) (distinguishing *Thompson* because the state "nowhere contends that [the speech] is false or misleading"); *Mo. Broads. Ass'n v. Schmitt*, 946 F.3d 453, 462 (8th Cir. 2020) ("Missouri concedes its Regulations facially restrict truthful, non-misleading commercial speech . . . .").

Marohn's speech is misleading because claiming to be a professional engineer is synonymous with claiming to be licensed. Every state in the country prohibits people from claiming to be a professional engineer unless the person has a professional engineer license.[5] Thirty-four of those states explicitly define "professional engineer" as someone

---

[5] Ala. Code § 34-11-2(c); Alaska Stat. § 08.48.281; Ariz. Rev. Stat. Ann. §§ 32-101(11)(b), 32-121; Ark. Code Ann. §§ 17-30-101(4)(B)(ii), 17-30-301; Cal. Bus. & Prof. Code § 6704(a); Colo. Rev. Stat. §§ 12-120-202(6)(b), 12-120-205(1); Conn. Gen. Stat. § 20-302; Del. Code. Ann. tit. 24, § 2802; D.C. Code § 47-2853.26; Fla. Stat. § 471.003(1); Ga. Code Ann. §§ 43-15-2(10), 43-15-7; Haw. Rev. Stat. § 464-14(a); Idaho Code. § 54-1201;

with an active license.[6] And within the design and construction industry, "professional engineer" refers to someone with a professional engineer license. (Doc. 48, ¶ 6.)

In the face of these facts, Marohn claims that when discussing Strong Towns' work, listeners do not distinguish between "engineer," "civil engineer," and "professional engineer." (Doc. 56, ¶ 68.) This claim is undercut by Marohn's subsequent claim, however, that using "professional engineer" enhances his credibility with his audiences. (*Id.*) If

---

225 Ill. Comp. Stat. 325/4(o); Ind. Code §§ 25-31-1-2(f), 25-31-1-27; Iowa Code §§ 542B.1, 542B.2(9)(b)(2); Kan. Stat. Ann. § 74-7001(b); Ky. Rev. Stat. Ann. §§ 322.010(15)(c), 322.020(1)(b); La. Stat. Ann. § 37:681; Me. Stat. tit. 32, § 1351; Md. Code Ann., Bus. Occ. & Prof. § 14-502; Mass. Gen. Laws ch. 112, §§ 81D, 81T; Mich. Comp. Laws § 339.2014; Minn. Stat. § 326.02, subd. 3(b); Miss. Code Ann. § 973-13-1; Mo. Rev. Stat. §§ 327.076(1), 327.181(1); Mont. Code Ann. § 37-67-102(1)(b); Neb. Rev. Stat. § 81-3441; Nev. Rev. Stat. § 625.520(1)(a)(4); N.H. Rev. Stat. Ann. § 310-A:25(I)(a)(2); N.J. Stat. Ann. § 45:8-27; N.M. Stat. Ann. § 61-23-21(C); N.Y. Educ. Law § 7202; N.C. Gen. Stat. § 89C-23; N.D. Cent. Code § 43-19.1-01; Ohio Rev. Code Ann. § 4733.02; Okla. Stat. tit. 59, § 475.1; Or. Rev. Stat. § 672.007(1); 5 R.I. Gen Laws § 5-8-20; 63 Pa. Stat. & Cons. Stat. Ann. § 150; S.C. Code Ann. § 40-22-30; S.D. Codified Laws §§ 36-18A-3, 36-18A-8; Tenn. Code Ann. § 62-2-105(c); Tex. Occ. Code Ann. § 1001.301; Utah Code Ann. § 58-22-501(1); Vt. Stat. Ann. tit. 26, § 1162; Va. Code Ann. § 54.1-406(C); Wash. Rev. Code. §§ 18.43.020(8)(b), 18.43.120; W. Va. Code §§ 30-13-3(e), 30-13-23; Wis. Stat. §§ 443.01(6), 443.02(2); Wyo. Stat. Ann. §§ 33-29-201(a)(vii)(A), 33-29-401.

[6] Ark. Code Ann. § 17-30-101(5); Colo. Rev. Stat. § 12-120-202(7); Del. Code. Ann. tit. 24, § 2803(27); Fla. Stat. § 471.005(5); Ga. Code Ann. § 43-15-2(9); Idaho Code § 54-1202(10); 225 Ill. Comp. Stat. 325/4(m); Ind. Code § 25-31-1-2(b); Kan. Stat. Ann. § 74-7003(o); Ky. Rev. Stat. Ann. § 322.010(3); Md. Code Ann., Bus. Occ. & Prof. § 14-101(k); Miss. Code Ann. § 973-13-3; Mo. Rev. Stat. § 327.011(13); Mont. Code Ann. § 37-67-101(9); Neb. Rev. Stat. § 81-3422; Nev. Rev. Stat. § 625.060; N.H. Rev. Stat. Ann. § 310-A:2(II); N.J. Stat. Ann. § 45:8-28(a); N.M. Stat. Ann. § 61-23-3(O); N.C. Gen. Stat. § 89C-3(8); N.D. Cent. Code § 43-19.1-02(10); Ohio Rev. Code Ann. § 4733.01(A); Okla. Stat. tit. 59, § 475.2(1); Or. Rev. Stat. § 672.002(2); R.I. Gen. Laws § 5-8-2(e); 63 Pa. Stat. & Cons. Stat. Ann. § 149(e); S.C. Code Ann. § 40-22-20(30); S.D. Codified Laws § 36-18A-1(24); Utah Code Ann. § 58-22-102(8); Vt. Stat. Ann. tit. 26, § 1161(7); Va. Code Ann. § 54.1-400; Wash. Rev. Code § 18.43.020(10); W. Va. Code § 30-13-3(f); Wyo. Stat. Ann. § 33-29-201(ix).

"professional engineer" enhances credibility as compared to just "engineer," then audiences must be distinguishing between the two. And by bringing this case, Marohn clearly believes that "professional engineer," standing alone, is recognized as something different than "retired professional engineer." Moreover, Marohn concedes being a professional engineer meant that he was "one of a handful of people in the state, in the country, who could say they were a licensed engineer." (Doc. 59-1, at 93:2, 16–18.)

Even if the Court accepts Marohn's self-serving claims about listener perceptions, a fact issue remains about whether Marohn's claims of being a professional engineer are misleading, due to the conflict with his deposition answers.[7] And, because the Court must resolve this fact issue in favor of the Board for purposes of Marohn's motion, this fact issue precludes applying the First Amendment at all to Marohn's speech and the Court should deny the motion.

### B.    Marohn's Speech Is Unprotected Fraudulent Speech and False Licensure Claims.

Besides being unprotected as false commercial speech, Marohn's speech is also unprotected as fraudulent speech and false claims of licensure. Marohn's motion for summary judgment does not address these alternative bases, and they are fully presented in the Board's motion for summary judgment. (Doc.47, at 14–20.) The Board briefly

---

[7] This is not to suggest that a material fact issue exists on the Board's cross-motion for summary judgment. Courts must disregard self-serving affidavits when presented in opposition to summary judgment. *See Frevert v. Ford Motor Co.*, 614 F.3d 466, 474 (8th Cir. 2010).

restates these arguments here as they are each independent reasons to conclude that Marohn's as-applied challenge fails.

Fraudulent speech is unprotected by the First Amendment. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025). Such speech is false speech "made to effect a fraud or secure moneys or other valuable considerations." *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality opinion). As discussed above, Marohn's speech is false because he is not a professional engineer. And Marohn is falsely claiming to be a professional engineer to secure valuable consideration: payments for books, courses, and presentations.

Additionally, false licensure claims are a category of historically unprotected speech. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 (2011) (recognizing some categories of speech may be historically unprotected even if not specifically identified in caselaw). Prohibitions against such claims pre-date the country's founding, continued to exist through the ratification of the First Amendment, and persist to the present day. Such prohibitions are also analogous to certification marks under trademark law. And the Supreme Court has recognized that—in light of the historical acceptance of trademark protections—regulations on the use of such marks does automatically trigger heightened First Amendment scrutiny. *Vidal v. Elster*, 602 U.S. 286, 295 (2024). Instead, such prohibitions are acceptable when, as here, there is a long history of acceptance of the prohibition. *See id.* at 301–07.

In addressing categories of unprotected speech, Marohn does devote considerable discussion to arguing that the Board cannot rely on the professional-speech doctrine because that doctrine was repudiated in *National Institute of Family & Life Advocates v.*

*Becerra*, 585 U.S. 755 (2018). (Doc. 55, at 15–17.) The Board agrees. And indeed, it has never argued that this doctrine would permit it to regulate the use of the professional engineer title. Instead, the professional-speech doctrine, when it existed, applied to speech made by professionals while practicing their profession. *NIFLA*, 585 U.S. at 767. This case, in contrast, deals with Marohn falsely claiming to be a professional when he is not one. *NIFLA* is inapposite.

Marohn's speech is fraudulent speech, false claims of licensure, and false commercial speech. The First Amendment does not protect such speech, so the Court should deny Marohn's motion for summary judgment.

### C.    Calling Oneself a Professional Engineer Is Not Public Advocacy.

Marohn also argues that, even if his licensure claims are commercial speech, since they accompany "public advocacy" strict scrutiny must still apply to Minnesota's prohibition. (*E.g.*, Doc. 55, at 15.) But claiming to be a professional engineer is not public advocacy. At best, the false licensure claims are intermingled with, but distinguishable from, other speech that Marohn claims is public advocacy. Marohn's argument is meritless.

First, Marohn's false licensure claims are not always intermingled with public advocacy. Instead, Marohn has claimed to be a professional engineer in marketing materials for his substantive speech, such as on course pages or on professional websites. In those instances, Marohn is clearly not engaged in public advocacy, and his speech does not receive the attendant protections such advocacy entails.

Moreover, even accepting that in some cases Marohn's false licensure claims and public advocacy are intermingled, the Supreme Court has specifically addressed the issue

of what to do when protected and unprotected speech mix. In *Board of Trustees of State University of New York v. Fox*, the Court dealt with a school's regulation of dorm-room Tupperware parties that contained both pure and commercial speech. 492 U.S. 469, 473–74 (1989). The Court rejected the argument that the two types of speech were so "inextricably intertwined" that the entirety had to be treated as noncommercial. *Id.* at 474. Instead, "[n]o law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares." *Id.* at 474. Communications can still be commercial (or other types of less protected speech) even though they contain discussions of important public issues. *Id.* at 475.

The same is true here. No law of man or nature makes it impossible to claim to be a professional engineer without critiquing road designs or to critique road designs without claiming to be a professional engineer. That Marohn chooses to do so in the same presentation thus does not extend the First Amendment protection of those critiques to his false licensure claims. Those claims are not protected by the First Amendment, and the Corut should deny Marohn's motion for summary judgment.

## II.    PROHIBITING MAROHN'S FALSE LICENSURE CLAIMS SATISFIES INTERMEDIATE AND STRICT SCRUTINY.

Even if the Court concludes that the undisputed facts exclude Marohn's speech from the unprotected categories above, the Court should still deny Marohn's summary judgment motion. As explained in the Board's memorandum supporting its motion for summary judgment, prohibiting Marohn's false licensure claims is only subject to—and withstands—intermediate scrutiny. (Doc. 47, at 20–24.) And even if strict scrutiny applies,

the prohibition satisfies that standard, too. (*Id.* at 24–28.) The prohibition is therefore still constitutional as-applied to Marohn's licensure claims.

> ### A.    Prohibitions on False Licensure Claims Satisfy Intermediate Scrutiny.

Whether intermediate or strict scrutiny applies to false statements of fact is an open question. The Supreme Court addressed this issue in *Alvarez*, but that case resulted in a splintered decision in which a four-justice plurality of the Court applied strict scrutiny, a two-justice concurrence applied intermediate scrutiny, and a three-justice dissent held that false statements of fact merit no First Amendment protection at all. 567 U.S. at 726, 729 (plurality opinion); *id.* at 732, 736–38 (Breyer, J., concurring); *id.* at 748 (Alito, J., dissenting). The Eighth Circuit has recognized that these opinions cannot be reconciled into any majority holding, and therefore "[w]ithout a single rationale from *Alvarez* that can be identified as a holding in the case, the only binding aspect of the decision is its specific result." *Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781, 785 (8th Cir. 2021).

Marohn ignores this splintered result, asserting that under *Alvarez* strict scrutiny must apply to prohibitions on false statements. (Doc. 55, at 18.) But Marohn fails to grapple with the fact that *Alvarez* was a plurality decision. Because of that splintering, however, this Court must decide as a matter of first impression what level of scrutiny to apply.

As explained in the Board's brief supporting summary judgment, the Court should apply intermediate scrutiny. (Doc. 47, at 21–22.) False licensure statements are of diminished value to the marketplace of ideas, meriting less First Amendment protection. *Virginia v. Black*, 538 U.S. 343, 358 (2003); *Alvarez*, 567 U.S. at 732 (Breyer, J., concurring). Moreover, falsehoods that implicate public safety, like false licensure claims,

ought not to warrant the near-automatic condemnation that strict scrutiny often implies. *Alvarez*, 567 U.S. at 731.

Minnesota's law passes intermediate scrutiny. A law survives intermediate scrutiny so long as it promotes a substantial governmental interest that would be achieved less effectively without the regulation and does not burden substantially more speech than necessary to further the interest. *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 520 U.S. 180, 213–14 (1997). The government may show a substantial interest through "anecdotes, history, consensus, and simple common sense." *Mo. ex. rel Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 654 (8th Cir. 2003). And states have a compelling (and thus also substantial) interest in establishing standards for licensing practitioners and regulating the practice of professions to protect public health, safety, and other interests. *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 625 (1995). Moreover, a statute remains valid even if a court disagrees with the legislature concerning the most appropriate method for promoting the state's interests or the degree to which those interests should be promoted. *Free Speech Coal.*, 606 U.S. at 496.

As explained in the Board's brief supporting its summary judgment motion, Minnesota's prohibition on falsely claiming to be a professional engineer satisfies this standard. (Doc. 47, at 23–24.) With respect to state interests, Minnesota has interests in (1) preventing unlicensed people from claiming to be professional engineers, following through with practicing, and causing public harm; (2) preventing dilution of the professional engineer title so that it remains useful to the public in actually discerning the

qualified practitioner from the charlatan; and (3) deterring unlicensed practice before it occurs by taking action against those who hold themselves out as capable of practice.

Prohibiting false licensure claims to achieve these interests does not burden substantially more speech than necessary. Minnesota's interest in ensuring that the public can identify professional engineers by their use of the title requires that the title only be used by professional engineers. Likewise, the prohibition is also necessary to further Minnesota's interest in deterring unlicensed practice before it occurs. Any lesser burden on speech would make it harder for the public to determine whether someone is qualified and limit the Board's ability to prevent unlicensed practice before it occurs. In contrast, the burden of Marohn referring to himself as a "retired" professional engineer (or any other term that does not indicate active licensure) is minimal. Accordingly, the statute satisfies intermediate scrutiny.

### B.    Marohn's Proposed Alternatives Would Not Vindicate the State's Interests.

Marohn suggests three ways that Minnesota could supposedly burden less speech. Because Marohn makes these proposals in the context of strict scrutiny, it is first worth stressing that under intermediate scrutiny, Minnesota's prohibition need not be the least restrictive means of achieving the state's interests. *Free Speech Coal.*, 606 U.S. at 496. As to Marohn's suggestions, first, he suggests prohibiting only "*licensed* professional engineer." (Doc. 55, at 15.) Second, he suggests limiting the prohibition to only when "one is engaged or offering to engage in providing engineering services." (*Id.*) Third, he

proposes publishing a list of licensees for the public to check. (*Id.* at 19.) None of these suggestions have merit.

### *"Licensed" Professional Engineer*

Beginning with the suggestion to prohibit only "licensed professional engineer," as an initial matter, prohibiting "professional engineer" versus "licensed professional engineer" does not burden substantially more speech so as to fail intermediate scrutiny. In comparison, in *TikTok*, the Supreme Court summarily rejected a "parade" of alternative proposals even though some of those alternatives had markedly less speech implications. *See* 604 U.S. at 71. Marohn's alternative proposal is much more modest than those proposals, because it would still prohibit speech but require the addition of one more word to trigger the prohibition. But if alternatives as different as those proposed in *TikTok* do not violate intermediate scrutiny, however, than the possibility of adding "licensed" also does not do so here.

Moreover, even if there were a substantial difference between the burdens of prohibiting "licensed professional engineer" versus "professional engineer," that difference is justified because the former would not adequately protect Minnesota's interests. The record shows that "professional engineer" means someone with a license. (Doc. 48, ¶¶ 4–6; Doc. 59-1, at 93:2, 93:13–18, 104:18–21, 121:15, 121:20–22). When people needing professional engineering services hire someone who claims to be a professional engineer, those people believe they are hiring someone qualified to perform those services. (*Id.*) As a result, if unlicensed people could refer to themselves as professional engineers, all of Minnesota's interests would be undercut. Commonsense dictates that it would be more

likely that unlicensed individuals would hold out and then follow through with performing substandard work. The title would cease to be a meaningful way for the public to find qualified individuals. And the Board would be unable to take action against those individuals until substandard work was performed. Moreover, this proposal would put Minnesota out of step with all other states. There is value to the public in having a common and accepted understanding of what "professional engineer" means. That value is undercut if "professional engineer" means someone with a license in forty-nine states but means nothing in Minnesota.

Additionally, to vindicate these interests, states must be able to designate *some* term as an indicator of licensure, and that term must be consistent over time. Marohn may not wish to use "licensed professional engineer." But one can easily imagine another retired professional engineer arguing that "licensed professional engineer" should be able to be used by anyone who has ever held a license and that the state should only be able to prohibit "currently licensed professional engineer." The possibilities for tacking other words on to "professional engineer" are endless. Ultimately, however, some term must be able to indicate licensure and there is an important interest in that term being consistent over time and across multiple jurisdictions. The term understood within the design community as designating that licensure—"professional engineer"—is the most natural fit for that indicator.

***Limit to Offers to Provide Services***

Marohn's second narrowing proposal is to limit Board enforcement actions to when people are engaging in or offering to engage in engineering services. There would be at least three problems with this approach.

The first problem is practical. The Board cannot read minds to know if someone who is falsely holding themselves out to the public as a professional engineer would actually turn down requests to perform work if asked, or if the person would go through with performing unlicensed work. Marohn implicitly acknowledged as much during his deposition. He conceded that, even after founding Strong Towns, people continued to approach him and ask him to perform engineering services. (Doc. 59-1, at 101:25–104:3.) The only way those people knew Marohn would not perform professional engineering services is because he told them so. (*Id.*) But one can easily imagine that if an unlicensed individual was trying to avoid discipline by the Board, that the person would deny an intent to perform services when asked by a Board investigator, even if they would perform said services if approached by a consumer. The Board would be constrained to taking action after unlicensed people had performed engineering services, at which point the harm to the public would already have occurred. This would harm both the consumer who paid for these services and the public whose safety is at risk from unlicensed engineering work. Such an approach clearly would not vindicate the state's interest.

The second problem with limiting enforcement to those who engage or offer to engage in performing engineering services is that this would not protect the state's interest in preventing the dilution of the professional-engineer designation. If anyone could claim

to be a professional engineer, then that designation would become useless to the public for determining whether someone is or is not qualified to perform professional engineering. To prevent that dilution from occurring, Minnesota needs to be able to prohibit the usage of the title by non-licensees even when they are not offering engineering services. Marohn argues that this interest is solely to protect the economic interests of the profession. This is not the case. Protecting the designation from dilution allows consumers to readily determine who is or is not licensed and therefore competent to perform services. Protecting the title from dilution makes it less likely that a consumer would waste time or resources on a project with an unlicensed engineer, or engage an unlicensed engineer to perform work that will be a public safety hazard.

The third problem is that even as-applied to Marohn, this proposal would not get him out of the Board's regulation because Marohn's claims of being a professional engineer would likely still constitute violations. Consider a billboard that just says "John Smith, Professional Engineer." The billboard does not explicitly say that Smith is available for hire as a professional engineer, but the context certainly implies it. The same is true if Smith (like Marohn) made those claims on a website, or in a book jacket. Readers see the claim of licensure and reasonably interpret it as indicating an ability to practice professional engineering. Thus, this proposal would not take Marohn's false licensure claims outside the scope of the statute.

*Publishing List of Licensees*

Marohn's third proposal is that the Board should simply rely on the publication of a list of licensees. The Board already does so, and experience shows this is insufficient to prevent unlicensed practice.

The Board has myriad examples of individuals who held out as professional engineers while unlicensed, proceeded to practice professional engineering, and were only discovered years later. (Doc. 60, ¶¶ 7–11.) In all of these examples, the unlicensed individual's unlicensed status was on the Board's website for the world to see. (Second Van Etta-Olson Decl. ¶ 4.) Their clients hired them anyway. Clearly, publishing a list of licensees online is insufficient to deter such unlicensed practice. Instead, the Board must be able to take action against people who hold themselves out as professional engineers without licenses. Such publication would also not vindicate the state's anti-dilution interests. If anyone could use title, it would still become less useful as a way to determine qualifications and the resulting harms that flow from that reduced utility would still occur.

\* \* \*

Minnesota's prohibition against calling oneself a professional engineer if one lacks a professional engineer license serves several substantial state interests and does not burden substantially more speech than necessary. None of Marohn's alternative proposals would adequately protect those interests. Accordingly, the Court should deny Marohn's motion for summary judgment.

C.    **Prohibitions on False Licensure Claims Satisfy Strict Scrutiny If It Applies.**

If the Court concludes that strict scrutiny applies to Minnesota's prohibition on falsely claiming to be a professional engineer, the prohibition satisfies that standard, too. Strict scrutiny requires that a statute be narrowly tailored to serve a compelling interest. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). As discussed in the Board's brief supporting summary judgment, Minnesota's prohibition on falsely claiming to be a professional engineer does so. (Doc. 47, at 24–28.)

First, Minnesota's prohibition serves several compelling state interests. The Supreme Court has recognized that states have a compelling interest in regulating the practice of professions. *Fla. Bar*, 515 U.S. at 625. And while this interest obviously embraces regulating who can make construction plans, it also extends to people using the professional engineer title before they perform any design work. Public safety requires that the public be able to determine who is actually qualified to perform professional engineering *before* they engage in the work itself. It also requires that the Board be able to prevent unlicensed practice before it occurs. Preventing unlicensed engineering services before they occur is critically important, as people could die if they are not pursued.

Second, Minnesota's prohibition is narrowly tailored to serve these interests. A statute is narrowly tailored if (1) the statute actually advances the state's interest, (2) the statute does not sweep too broadly, (3) the statute does not leave significant influences bearing on the interest unregulated, and (4) no other statute could advance the interest as well and infringe less speech. *Doe v. Bell*, 969 F.3d 883, 892 (8th Cir. 2020).

Minnesota's statute is so tailored. As to the first three requirements, Minnesota's prohibition actually advances the state's interest because it reduces the likelihood that unlicensed people will advertise and then carry through with performing professional engineering, it preserves the title as a tool for determining who is qualified, and it deters unlicensed practice before it occurs. And statute does not sweep too broadly or leave significant influences unregulated because it targets any representation that would lead the public to believe someone is a professional engineer but does not extend beyond that scope.

Marohn focuses his strict scrutiny argument on the fourth requirement, making proposals for alternatives that would supposedly prohibit less speech. (Doc. 55, at 15.) Marohn's proposals for other statutes fail under strict scrutiny for the same reasons they fail under intermediate scrutiny. First, prohibiting "licensed professional engineer" versus "professional engineer" does not actually infringe less speech because those terms are synonymous. Moreover, this would undercut the public benefit of having a uniform understanding of what "professional engineer" means in every state. Second, limiting regulation to offers to practice would not vindicate the state's interests because the Board has no way of knowing which unlicensed individuals would turn down performing professional engineering work if asked to perform it and who would endanger the public by performing the work. This proposal would also not vindicate the state's interest in preventing title dilution and public safety harms that flow from being unable to discern qualified from unqualified individuals. Third, experience shows that publishing a list of licensees does not adequately advance the state's interests. Members of the public hire unlicensed individuals to practice professional engineering notwithstanding that the Board

already publishes such a list. While being able to sanction false claims of licensure may not stop all such practice, it serves as a deterrent, and that deterrent effect would be wholly absent if the Board could not do so. Moreover, as with Marohn's other two proposals, list publication would also not vindicate the state's interest in ensuring that "professional engineer" remains a term by which members of the public can discern whether someone is qualified or not.

Because Minnesota has compelling interests in prohibiting unlicensed individuals from claiming to be professional engineers and its prohibition is narrowly tailored to achieve those interests, Minnesota's statute satisfies strict scrutiny. Accordingly, Marohn's as-applied challenge to that statute still fails, and the Court should deny Marohn's summary judgment motion even if strict scrutiny applies.

## CONCLUSION

Marohn's false licensure claims are unprotected by the First Amendment. And even if they are entitled to some protection, the prohibition against them satisfies intermediate and strict scrutiny. The Court should deny Marohn's motion for summary judgment.

Dated:  November 12, 2025          Respectfully submitted,

KEITH ELLISON
State of Minnesota
Attorney General

s/**Allen Cook Barr**

ALLEN COOK BARR (#0399094)
STEPHEN MELCHIONNE (#0391374)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1487 (Voice)
allen.barr@ag.state.mn.us
stephen.melchionne@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS

|#6213633